*Attorney Grievance Commission v. Stuart R. Blatt*
Misc. Docket AG No. 42, September Term 2017


**Attorney Discipline – Misappropriation of Client Funds – Mishandling of Attorney Trust Account – Disbarment.** Disbarment is the appropriate sanction when an attorney failed to represent clients competently and diligently and to communicate with them adequately concerning the matters that the clients had assigned to the collections practice at the attorney's firm, which was supervised by the attorney; the attorney failed to adequately supervise attorney and clerical staff at his firm, to the detriment of his clients; and the attorney mishandled the proceeds obtained on behalf of those clients and misappropriated some of those funds.
MLRPC 1.1, 1.3, 1.4, 1.15(a), (c) & (d), 1.16(d), 5.1(a) & (b), 5.3(a)–(c), 8.4(a), (c) & (d).

Circuit Court for Baltimore County
Case No. 03-C-17-011570
Argument: January 31, 2019

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 42

September Term, 2017

_____

ATTORNEY GRIEVANCE COMMISSION

V.

STUART R. BLATT

_____

Barbera, C.J.,
Greene
McDonald
Hotten
Getty
Wilner, Alan M. (Senior Judge,
Specially Assigned)
Adkins, Sally D. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by McDonald, J.

_____

Filed: May 22, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

A law license authorizes an attorney to invoke the coercive powers of a court in furtherance of the interests of the attorney's client with consequences that can be devastating, even if fair, to the adverse party. Under the ethical rules governing attorneys, that authority must be exercised competently, diligently, and honestly, with adequate supervision of subordinate employees who assist the attorney, and in compliance with the attorney's fiduciary responsibilities to the client.

By the account in the record before us, Respondent Stuart R. Blatt was for many years a respected member of the bar and a leader in the field of creditors rights and debt collection. However, during the past decade his practice fell on hard times and, in what must have seemed a cruel twist of fate, he became one of those he sued and otherwise pursued for a living – a defaulting debtor. As a result, he made unfortunate choices that violated the ethical rules governing attorneys – for example, using legal process to collect a debt on behalf of a client by garnishing wages earned by the debtor, but diverting the proceeds to pay his firm what it had not earned. There is no indication in the record before us that these violations were the product of a grand fraud scheme, as opposed to an effort to find a path out of a confluence of unhappy events, both personal and professional. Nevertheless, in carrying out our charge to protect the public from errant lawyers, we must disbar Mr. Blatt from the practice of law in Maryland.

# I

## Background

### A.    *Procedural Context*

On November 20, 2017, the Attorney Grievance Commission ("Commission") through Bar Counsel filed with this Court a petition for disciplinary or remedial action against Mr. Blatt, alleging that he had violated numerous provisions of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") in effect at the time of the alleged misconduct.[1]    In particular, Bar Counsel alleged that he had violated Rule 1.1 (competence); Rule 1.3 (diligence); Rule 1.4 (communication); Rule 1.15(a), (c) & (d) (safekeeping property); Rule 1.16(d) (declining or terminating representation); Rule 5.1(a) & (b) (responsibilities of partners, managers, and supervisory lawyers); Rule 5.3(a), (b) & (c) (responsibilities regarding non-lawyer assistants); Rule 8.1(a) (bar admission and disciplinary matters); and Rule 8.4(a), (c) & (d) (misconduct).

Pursuant to Maryland Rule 19-722(a), this Court designated Judge Vicki Ballou-Watts of the Circuit Court for Baltimore County to hold a hearing, make findings of fact, and provide conclusions of law as to the alleged violations by Mr. Blatt.  Judge Ballou-Watts conducted an evidentiary hearing over several days in August 2018.  Following that hearing, Bar Counsel withdrew the charge of a violation of Rule 8.1(a).  In a written

---

[1] Effective July 1, 2016, the MLRPC were renamed the Maryland Attorneys' Rules of Professional Conduct and recodified in Title 19 of the Maryland Rules.  For simplicity, and because the alleged misconduct occurred prior to the recodification, we shall use the shorter designations of the MLRPC throughout this opinion – *e.g.*, "Rule 8.4" rather than "Maryland Rule 19-308.4."

opinion, Judge Ballou-Watts found that Mr. Blatt had committed all of the other alleged violations.

Mr. Blatt filed a number of exceptions to the hearing judge's Findings of Fact and Conclusions of Law. Bar Counsel did not file any exceptions and recommended that we disbar Mr. Blatt. This Court heard oral argument from Bar Counsel and Mr. Blatt on January 31, 2019.

### B. *Facts*

When no exception is made to a hearing judge's finding of fact, we accept it as established. Maryland Rule 19-741(b)(2)(A). When a party excepts to a finding, we must determine whether the finding is established by the requisite standard of proof – in the case of an allegation of misconduct, clear and convincing evidence. Maryland Rules 19-741(b)(2)(B), 19-727(c). We summarize below the hearing judge's findings and other undisputed matters in the record. We address Mr. Blatt's exceptions in relation to the findings to which they pertain.

*Mr. Blatt's Early Career*

Mr. Blatt is a 1970 graduate of the University of Baltimore School of Law and became a member of the Maryland bar in June 1972. Mr. Blatt has also been admitted to the District of Columbia and New York bars. Early in his career, Mr. Blatt served briefly as an in-house counsel to a credit card company and later as an in-house counsel for a department store chain. After six years at the department store chain, Mr. Blatt worked briefly for two law firms before opening his own firm. Following a brief stint with another firm, he struck out on his own again in the mid-1990s.

3

Over the course of his career, Mr. Blatt focused his practice on creditors rights and debt collection. He is a founder of the National Creditors Bar Association and served as its president. He was also involved in other organizations related to creditors rights and debt collection.

*Merging the Practice into the Margolis Firm*

Following a health scare in 2000, Mr. Blatt sought to merge his law practice with that of another firm. He ultimately brought his creditors rights practice to a Baltimore County firm then known as Margolis, Pritzker and Epstein, P.A. At that time, the firm had a general practice that included personal injury and family law litigation, as well as the representation of automobile dealerships, construction companies, and small businesses, but the firm did not have a creditors rights practice. Within a couple years, Mr. Blatt became a principal in the firm, which was renamed Margolis, Pritzker, Epstein & Blatt, P.A.

For a decade, the Margolis firm thrived. By the time of the events pertinent to this case, the two remaining active principals in the firm were Mr. Blatt and Jeffrey Pritzker. The creditors rights practice, which was overseen by Mr. Blatt, came to dominate the firm by many measures. By 2010, it accounted for approximately 85% of the firm's revenues (as well as most of its expenses) and employed a large administrative staff. At its peak, the creditors rights practice had more than 70 employees who used a state-of-the-art computer software system and managed 26,000 files. Mr. Blatt signed all complaints initiating collection actions and supervised the associate attorneys who litigated those actions. His wife, Sharon Blatt, who had been a clerical employee in the creditors rights

4

practice, became its office manager. The firm also opened a Virginia office devoted to its creditors rights practice in 2010 or 2011.

*The Decline of the Margolis Firm*

The firm began a downward spiral when Citibank, Mr. Blatt's largest client for many years, decided to reduce the number of law firms to which it referred collection matters and stopped referring business to the Margolis firm. Other clients made similar decisions. In an attempt to shore up its finances, the firm cut staff dramatically and moved its banking relationship from Wells Fargo to a smaller bank – Revere Bank. Nonetheless, the firm proved unable to pay its bills and, during the summer of 2014, was evicted from its offices at 110 West Road in Towson. The firm obtained new office space in Towson.

In November 2014, Mr. Pritzker left the firm and opened a solo practice at a different location. The remnant of the firm devoted to the creditors rights practice remained in the new Towson office until January 2015 when the electricity was shut off due to unpaid utility bills. The Virginia office of the firm closed the following month.

Mr. Blatt made an effort to move his creditors rights practice to another law firm known as the Steve Peroutka Law Group, and moved equipment and files to that firm while still negotiating their relationship. However, the Peroutka firm became concerned that Mr. Blatt was not being transparent in the transfer of clients and matters.[2] Eventually, the

---

[2] Mr. Blatt excepts to the hearing judge's conclusion that he failed to communicate with the Peroutka firm about client files, but he provided no alternative account of that relationship. He argues that he had health issues during his firm's demise and that he should not be held responsible for the firm's woes. This argument appears to be more a matter of mitigation than a defense to the allegations of misconduct.

arrangement fell through and two longtime employees of Mr. Blatt's debt collection practice helped him move his files from the Peroutka firm to his home in early May 2015.

*Financial Mismanagement*

Mr. Blatt's mismanagement of, and misappropriation from, certain accounts at the Margolis firm during its decline is at the core of many of the charges against him.

Revere Bank, as a condition of providing a loan to the Margolis firm, had required that the firm move its accounts to the bank. As a result, the debt collection practice maintained its accounts at Revere Bank. The firm's loan from Revere Bank was repaid by means of debits charged to the firm's operating account. Mr. Blatt had signature authority with respect to the firm's bank accounts, as did Mr. Pritzker and Sharon Blatt.

Britni MacDonald was the financial manager at the Margolis firm for the last three years of its existence and later moved with Mr. Blatt to the Peroutka firm. At the Margolis firm, she was supervised by Sharon Blatt. She was familiar with the flow of funds collected by the firm for its clients and described those practices at the hearing in this case.[3]

The firm maintained several accounts as repositories for collected debts. Funds collected for larger clients were deposited into accounts specifically designated for each of those clients. Funds collected for smaller, less lucrative clients were aggregated in an account called the "General Collections Account," which Ms. MacDonald characterized as "a catch-all account." According to Ms. MacDonald, within a day after collected funds

---

[3] Mr. Pritzker also testified at the hearing, as did a representative of the Peroutka firm. Bar Counsel also presented the testimony of representatives of four clients who had filed complaints about Mr. Blatt. Mr. Blatt testified on his own behalf.

were deposited into one of these accounts, she would withdraw the portion of the amount collected that equaled the firm's legal fee. The remainder of collected funds would be remitted from these accounts to clients, along with a detailed accounting, on a weekly basis for larger clients and on a monthly basis for smaller clients. Although the General Collections Account received and held client funds, it was not established as an attorney trust account.

Ms. MacDonald testified that she was directed – on various occasions by Mr. Blatt, Mr. Pritzker, or Sharon Blatt – to "borrow" money from these accounts on behalf of the firm when the firm needed money for payroll or its other bills. As a result, the General Collections Account sometimes had insufficient funds to pay the monthly remittances to all of the firm's smaller collections clients. Ms. MacDonald would receive instructions from Sharon Blatt, who had consulted with Mr. Blatt and Mr. Pritzker, as to which clients would be paid and which would not.

When the Margolis firm began experiencing severe financial distress in 2014, it opened an account entitled the "General Collections II Account," which was labeled an escrow account and which was not subject to being debited by Revere Bank for repayment of the firm's loan. Although labeled an "escrow" account, the General Collections II Account was not established and maintained as an attorney trust account. Rather, it functioned more as an operating account. At times, client funds were transferred from the General Collections Account to the General Collections II Account.

At the end of May 2015, more than $50,000 remained in the General Collections Account. According to Ms. MacDonald, those funds consisted entirely of client funds, as legal fees related to those collections had already been removed from the account.

In June 2015, Sharon Blatt made an electronic transfer of $24,500 from the General Collections Account to the General Collections II Account. At approximately the same time, Mr. Blatt issued a check drawn on General Collections II Account to "Stuart Blatt and/or Blatt Law." The money was deposited into an account at PNC Bank in the name of "Blatt Law Group, LLC." The PNC account was not designated an attorney trust account. According to Mr. Blatt, he moved the funds from Revere Bank to the PNC account to avoid the possibility that Revere Bank would claim those funds to offset the firm's debt to Revere Bank. Mr. Blatt testified at the hearing that Ms. MacDonald had told him that the $24,500 all related to the firm's attorney's fees. The hearing judge did not find this testimony credible, in light of Ms. MacDonald's testimony that attorney's fees were withdrawn from collected debt funds within a day or so of each deposit into the General Collections Account.[4]

---

[4] Mr. Blatt excepts to this finding concerning his credibility. He asserts that the account at PNC Bank was an operating account and that, like the General Collections II Account, it was created to avoid the funds being attached by Revere Bank. Of course, it is the hearing judge's role to decide whether or not to credit a particular witness or particular testimony. *Attorney Grievance Comm'n v. Page*, 430 Md. 602, 627 (2013). In any event, even if Mr. Blatt's motive was to render the funds less susceptible to attachment by a creditor of the firm (*i.e.*, Revere Bank), that does not contradict the hearing judge's finding that those funds were client funds and that Mr. Blatt was responsible for the handling of the funds collected on behalf of the firm's clients.

Shortly after the transfer of funds from Revere Bank to the PNC account, the Margolis firm defaulted on its loan from Revere Bank. In September 2015, Revere Bank closed various accounts of the firm at the bank, including the General Collections Account, the General Collections II Account, and the firm's Interest on Lawyer Trust Account ("IOLTA account"), and applied the remaining funds against the firm's liability for its loan from the bank.[5] Mr. Blatt has taken no action to recover any client funds that may have been in those accounts.

*Mishandling of Client Matters*

Testimony and evidence introduced at the hearing concerned four specific incidents in which the firm's clients were harmed by Mr. Blatt's misconduct. Two of those incidents involved complaints that Mr. Blatt, or attorneys supervised by him, had garnished the wages of a debtor on behalf of a client without remitting the proceeds to the client. In one of those incidents, the judgment against the debtor was allowed to expire without being renewed, thereby exposing the client to liability to the debtor for a wrongful garnishment. In another incident, Mr. Blatt and attorneys under his supervision failed to file lawsuits on behalf of a client before the pertinent statute of limitations expired and failed to return funds advanced by the client for filing fees related to those cases. A fourth complaint related to Mr. Blatt's failure to remit amounts collected from a debtor on behalf of a client to that client.

---

[5] The bank collected $371.90 from the General Collections Account, $6,613.43 from the General Collections II Account, and $1,107.48 from the firm's IOLTA accounts.

(1)     Complaint of Harvard Drug Group

Before its acquisition in 2015 by another company, Harvard Drug Group, LLC, was a Michigan company that distributed prescription and over-the-counter medications to pharmacies, physicians, and other healthcare entities.  In 2000, Harvard Drug Group retained Mr. Blatt in a collection matter involving one of its Maryland customers, Alvin Perkins.  On behalf of Harvard Drug Group, Mr. Blatt filed suit against Mr. Perkins, individually and trading as Neighborhood Pharmacies, in the Circuit Court for Prince George's County.  On December 8, 2000, he obtained a judgment in favor of Harvard Drug Group that included $108,521.20 for the principal, $15,092.65 for prejudgment interest, and $16,278.18 for attorney's fees, plus costs and post-judgment interest.

Mr. Blatt began garnishing wages of Mr. Perkins, who then worked for CVS Pharmacy, Inc.  Mr. Blatt's firm regularly forwarded the garnished funds to Harvard Drug Group every two or three months, accompanied by an accounting that explained the disbursement.  By 2012, the payments forwarded by Mr. Blatt's firm became more sporadic.  On October 15, 2014, Harvard Drug Group received three checks totaling $9,171.34 in one envelope from Mr. Blatt.  The three checks were drawn on the General Collections Account under Mr. Blatt's signature and related to funds garnished from Mr. Perkins' wages during the period between December 2013 and July 2014.

Following receipt of those checks, Harvard Drug Group received no additional payments from Mr. Blatt with respect to the Perkins matter.  However, Mr. Blatt's firm continued to garnish Mr. Perkins' wages and deposited a total of $7,100.83 into the General Collections Account.

10

In the meantime, the judgment against Mr. Perkins had expired as Mr. Blatt had taken no action to renew the judgment. In July 2015, Mr. Perkins filed a motion to end the garnishment because the judgment had expired. Mr. Blatt was mailed a copy of the motion at his firm's former address, although it is unclear whether Mr. Blatt received that copy as he had not updated the court as to his address. In any event, Mr. Blatt did nothing to oppose the motion, to renew the judgment, or to inform Harvard Drug Group.

On October 16, 2015, the Circuit Court for Prince George's County granted Mr. Perkins' motion. As part of that ruling, the court ordered Harvard Drug Group to return all amounts garnished from Mr. Perkins' wages since October 2014. When no payment was forthcoming, Mr. Perkins sought a judgment against Harvard Drug Group for $14,000 plus costs and attorney's fees. This motion was sent to Mr. Blatt and to Harvard Drug Group's general counsel in Michigan. When Harvard Drug Group sought to contact Mr. Blatt, they could not find him.

Harvard Drug Group never received any of the funds garnished by Mr. Blatt from Mr. Perkins' wages after October 2014. The company ultimately settled with Mr. Perkins concerning the funds garnished from him after expiration of the judgment by paying him $15,000 plus $5,000 for attorney's fees. Mr. Blatt did not make any restitution to Harvard Drug Group with respect to those payments.

Mr. Blatt never informed Harvard Drug Group that the Perkins judgment had expired without being renewed and that his firm had continued to garnish Mr. Perkins' wages on its behalf after October 2014. Nor did he inform Harvard Drug Group that the Margolis firm had closed, that he was planning to join the Peroutka firm, or that his

relationship with the Peroutka firm was later terminated. He failed to provide Harvard Drug Group with a client file or a full accounting of his firm's work on the Perkins case.[6]

(2)    Complaint of Doris Mayer

On August 25, 2011, Doris Mayer obtained a judgment of $16,100.45 against Carter Tuck in a Virginia state court. The attorney who represented her in that case garnished Mr. Tuck's wages and collected part of the judgment on her behalf but passed away before the matter was completed. After the attorney died, his secretary forwarded Ms. Mayer's file to an attorney in the Virginia office of Mr. Blatt's firm.

In August 2014, the firm began attempting to collect the remaining debt from Mr. Tuck. From November 2014 to February 2015, the firm received seven checks totaling $1,102.36 that represented funds garnished from Mr. Tuck's wages. The checks were deposited in the General Collections Account, but Ms. Mayer was not informed that the checks had been received and none of the funds were sent to Ms. Mayer. Ms. Mayer made at least 20 calls to the firm inquiring about her case, but never was able to speak to an attorney at the firm. She requested her file on numerous occasions.

Ms. Mayer subsequently retained another attorney, Charles Krumbein, to obtain information about her case. On April 20, 2015, while Mr. Blatt's collections practice was

---

[6] Mr. Blatt excepts to the finding by the hearing judge that he was responsible for the mishandling of the Perkins matter. It was undisputed that Mr. Blatt had originally filed the collection case when he had his own practice and brought the case with him when he moved to the Margolis firm. Moreover, the hearing judge was entitled to credit the testimony of Britni MacDonald, the firm's financial manager, that Mr. Blatt was responsible for and active in managing the General Collections Account. Mr. Blatt's stamped signature was on all the checks sent to Harvard Drug Group.

working out of the office of the Peroutka firm, a check drawn on the General Collections Account was sent to Ms. Mayer in the amount of $826.76. Mr. Blatt's stamped signature was on the check. No explanation was provided to her with the check.

On May 4, 2015, Mr. Krumbein wrote Mr. Blatt to inform him that Mr. Krumbein now represented Ms. Mayer, to request her file, and to demand an accounting. No file or accounting was ever provided, and throughout the process neither Mr. Blatt nor any other attorney from his collections practice ever spoke to Ms. Mayer about her case or informed her that the firm was closing.[7]

(3)    Complaint of Montgomery County Employees Federal Credit Union

The Montgomery County Employees Federal Credit Union ("the credit union") provides banking and financial services to its members – county employees and their families. In 2007, the credit union entered into an agreement with Mr. Blatt's firm to represent it in collection matters. When the credit union would refer a new matter to the firm, the firm would send an acknowledgment signed by Mr. Blatt. Checks to the credit union representing amounts collected were likewise signed by Mr. Blatt. Through 2014, the firm made regular disbursements to the credit union, each with an accompanying report detailing the debts collected.

---

[7] Mr. Blatt excepts to the hearing judge's finding that he was responsible for the mishandling of Ms. Mayer's collection case, noting that he is not a member of the Virginia bar. The testimony of Mr. Pritzker and Ms. MacDonald, however, provided clear and convincing evidence, if believed by the hearing judge, to support the finding that Mr. Blatt was the supervisor of the firm's collections practice, including the Virginia office. There also appears to be no dispute that the Virginia office of the firm was devoted exclusively to collection matters.

On January 28, 2015, the firm sent the credit union a check under Mr. Blatt's signature drawn on the General Collections Account in the amount of $2,933.06. Accompanying that check was a "Combination Disbursement and Collection Report" for the period August 6, 2014 through January 16, 2015, which indicated that the firm had collected payments from eight debtors of the credit union during that period.

After this payment, Mr. Blatt's firm sent no additional disbursements or accountings to the credit union. However, the firm continued to collect debts owed to the credit union. In particular, the firm received four additional checks payable to Mr. Blatt from Nathaniel Butler, a debtor of the credit union, in the amount of $200 each over the period from February 2015 to April 2015. The firm also received a check on behalf of Carlos Gomez, another debtor of the credit union, payable to the firm in the amount of $60. All of these checks were deposited into the firm's General Collections Account, but no payment or accounting was ever sent to the credit union.[8]

Mr. Blatt never told the credit union that the Margolis firm had closed, nor did he ever apprise the credit union of his plan to join the Peroutka firm. At the time that the Margolis firm went out of business, it was pursuing approximately 200 collection matters

---

[8] Mr. Blatt excepts to the finding that he was responsible for the funds sent to his firm by the credit union's debtors that were not paid over, or even accounted for, to the credit union. It was essentially undisputed that Mr. Blatt was in charge of the collections practice, including the General Collections Account. It was Mr. Blatt's responsibility to account to the credit union for the funds obtained on its behalf and to inform the credit union that the Margolis firm had closed and that he had moved the collections practice to another law firm.

14

for the credit union. Only five of these accounts were transferred to the Peroutka firm before that firm ended its relationship with Mr. Blatt.

Mr. Blatt never provided any files, updates, or accountings to the credit union regarding the status of the credit union's accounts assigned to the Margolis firm at the time the firm closed.[9] When a new collections specialist took over at the credit union in January 2016, she attempted to locate Mr. Blatt, but was unable to find him. The hearing judge found that Mr. Blatt's failure to provide information to the credit union impaired the credit union's ability to determine which claims were still viable. As a result, it was forced to charge off claims that it had referred to Mr. Blatt's firm.

(4)     Complaint of Douglas, Knight & Associates

Douglas, Knight & Associates ("DKA") is an insurance subrogation firm in Florida that assists insurance companies in the collection of funds. If legal action is appropriate, DKA hires a law firm to file suit and collect judgments.

On December 18, 2013, DKA's Litigation Coordinator referred two collection matters to Mr. Blatt at the Margolis firm. The first concerned a claim against Bridgette Crawley in the amount of $22,977.84; and the second was a claim in the amount of $8,600.00 against Imelda De Los Angeles. The statute of limitations for the Crawley

---

[9] Mr. Blatt excepts to the finding that he "was the supervising attorney of the firm's collections practice at all times referenced in the Disciplinary Petition." The testimony of Mr. Pritzker and Ms. MacDonald, however, provided clear and convincing evidence, if believed by the hearing judge, to support the finding that he was the supervisor of the firm's collections practice.

matter would expire 18 months later on May 6, 2015; the statute of limitations applicable to the De Los Angeles matter would expire nearly a year later on November 30, 2014.

Stefan Sisek, the Data Administrator for the Margolis firm, was DKA's point of contact at the firm. Mr. Sisek informed DKA that a demand for payment had been made in each case and that a lawsuit was the recommended course of action. DKA agreed to that course of action and, in October 2014, sent a $200 check for court costs to the firm with respect to each case. These funds were placed in the General Collections Account.

In August 2014, DKA assigned two additional collection matters to the firm – a claim against Ikea Gartrell in the amount of $23,691.31 and a claim against Catherine Roman in the amount of $257,301.21, of which the firm was to collect $157,301.21 not covered by Ms. Roman's insurer.

Mr. Blatt failed to file lawsuits in the Crawley, De Los Angeles, and Gartrell matters before the statute of limitations expired as to those claims. The funds that had been provided by DKA for filing fees were not placed in an attorney escrow account or refunded to DKA. In the Roman matter, Mr. Blatt's son, who was an associate attorney in the firm at the time, did file a complaint, but the firm failed to serve the complaint on the defendant and the complaint was subject to being dismissed for lack of prosecution.

Despite DKA's repeated requests for updates on the cases, Mr. Blatt provided no information. On March 17, 2015, a representative of DKA finally reached Mr. Blatt by phone. Mr. Blatt promised that he would look into the four cases. On April 2, 2015, Mr. Blatt informed DKA by phone that he could not locate some of the files and that Mr. Pritzker was the attorney in charge of handling the DKA subrogation claims. During these

calls, Mr. Blatt never mentioned that the Margolis firm had closed and that he was now working with the Peroutka firm. When DKA contacted Mr. Pritzker, it learned that he no longer worked with Mr. Blatt and that Mr. Pritzker had never been in charge of the DKA subrogation matters.

Mr. Blatt had additional contact with DKA by phone during June 2015, but never produced a full accounting or any information about the matters DKA had assigned to his firm. Nor did Mr. Blatt ever refund DKA the money it sent for court costs.[10]

*Impact of Mr. Blatt's Health Problems*

At the hearing, Mr. Blatt testified about a number of medical issues he had encountered during the decline of the Margolis firm, stating that those difficulties limited his oversight of the firm's collections practice and that the stress of the declining practice exacerbated his medical problems. In his exceptions, Mr. Blatt disclaimed responsibility for various problems with his firm's collections practice. The hearing judge did not find Mr. Blatt's claims of limited involvement to be credible, in light of the testimony of the financial manager of the collections practice that Mr. Blatt decided what lawsuits to file and which clients to pay the proceeds that they collected and in light of Mr. Blatt's own testimony as to his activities on behalf of the firm.

---

[10] Mr. Blatt excepts to the hearing judge's finding that he bore responsibility for the firm's mishandling of the claims referred by DKA. The hearing judge was entitled to credit the testimony of the representative of DKA, who testified at the hearing via a video *de bene esse* deposition, about her conversations with Mr. Blatt with respect to those matters.

## Discussion

The hearing judge concluded that Mr. Blatt had committed all of the violations alleged by the Commission. Mr. Blatt excepts to those conclusions. We review a hearing judge's conclusions of law *de novo*. Maryland Rule 19-741(b)(1). We consider Mr. Blatt's exceptions as part of that review.

*Failing to Meet Basic Standards*

We agree with the hearing judge that Mr. Blatt violated Rules 1.1 (competence), 1.3 (diligence), 1.4 (communication), and 1.16(d) (terminating representation).

Rule 1.1 requires that a lawyer provide competent representation to a client. An attorney may have adequate knowledge and skill, but violate the rule by failing to apply that knowledge or skill appropriately in specific cases. *Attorney Grievance Comm'n v. Woolery*, 456 Md. 483, 495 (2017). Rule 1.3 requires that a lawyer be reasonably diligent in representing a client.

The hearing judge found that Mr. Blatt violated both Rule 1.1 and Rule 1.3 when, contrary to his responsibilities as supervising attorney of the collections practice, he failed to adequately ensure that client funds were protected, and when he failed to notify Harvard Drug Group of its expiring judgment against Mr. Perkins. The failure to maintain funds received on behalf of a client in a trust account demonstrates incompetence. *Attorney Grievance Comm'n v. Maignan*, 390 Md. 287, 296-97 (2005).

Mr. Blatt partially excepts to these conclusions. He apparently does not contest that the failure to alert a client to the pending expiration of a judgment in its favor – and

continuing to garnish wages based on that judgment after it expired (thereby exposing the client to liability to the debtor) – violated his obligation to act competently and diligently. However, he asserts that depositing client funds in the General Collections Account does not demonstrate incompetence because, in his view, that account was an attorney trust account. That assertion appears to contradict a stipulation by the parties at the hearing that the account was <u>not</u> maintained as a trust account. Regardless of whether the General Collections Account may have begun as an attorney trust account, the evidence at the hearing was clear and convincing that by 2014 it was being used as an operating account to help pay expenses of the Margolis firm. According to the testimony of the firm's financial manager, which the hearing judge found credible, Mr. Blatt actively managed that account. Mr. Blatt's exception is without merit.

Rule 1.4 establishes baseline standards that attorneys must meet in communicating with clients. It states:

(a) An attorney shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;

(2) keep the client reasonably informed about the status of the matter;

(3) promptly comply with reasonable requests for information; and
. . .

(b) An attorney shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

The hearing judge found that Mr. Blatt violated Rule 1.4 in his representation of Ms. Mayer, DKA, Harvard Drug Group, and the credit union. Mr. Blatt excepts to that

conclusion seemingly on the grounds that he cannot be blamed for the mistakes of those he supervised at a time when he was dealing with health issues.[11] In our view, his actions – or perhaps more precisely, inaction – with respect to each of the four clients spotlighted at the hearing prove that he violated Rule 1.4. It is undisputed that his firm collected funds related to debts owed to three of those clients (Ms. Mayer, Harvard Drug Group, and the credit union) and failed to take appropriate action on behalf of two of those clients (DKA, Harvard Drug Group) without advising the client as to what the firm had done – or not done. Moreover, the firm failed to respond to numerous requests from those clients for information, many of which were directed to Mr. Blatt himself.

Rule 1.16(d) requires that, upon termination of representation of a client, "a lawyer shall take steps to the extent reasonably practicable to protect a client's interest." Such steps include "giving reasonable notice to the client, allowing time for employment of another lawyer, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred." The hearing judge found that Mr. Blatt violated Rule 1.16(d).[12]

Mr. Blatt failed to fulfill any of the duties enumerated in Rule 1.16(d) when he effectively terminated his representation of Ms. Mayer, DKA, Harvard Drug Group, and

---

[11] Namely, Mr. Blatt states he excepts "for the overall reason that he was considered to be blameworthy or culpable for any mistake, lack of supervision or omission of staff, when and while he was absent from the firm's operation."

[12] Mr. Blatt formally excepts to this conclusion, but does not elaborate other than to incorporate by general reference his exceptions to the hearing judge's fact findings. As indicated above, we overrule those exceptions.

the credit union. He failed to inform any of those clients that the Margolis firm was closing, that he planned to move his practice to the Peroutka firm, or that the plan to do so ultimately fell through. He did not provide files or a full accounting to those clients about their cases. Mr. Blatt also failed to surrender the property of DKA when he did not return the money it had sent for court costs in cases that were never filed. Similarly, he never forwarded to the credit union or Harvard Drug Group the funds collected on their behalf.

*Mishandling Money Matters*

We agree with the hearing judge that Mr. Blatt violated Rule 1.15(a), (c) & (d), which pertain to safekeeping of client property.

Rule 1.15(a) requires a lawyer to "hold the property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property" and to maintain "complete records of the account funds."

Rule 1.15(c) specifies that "a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred." Only if a client provides the client's consent in writing can this provision be waived.

Finally, Rule 1.15(d) dictates an attorney's actions when client funds are received. A lawyer (1) "shall promptly notify the client or third person," (2) "shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive," and (3) "shall render promptly a full accounting regarding such property" upon request.

21

The hearing judge found that Mr. Blatt violated Rule 1.15 with respect to each of the four clients whose experience was outlined at the hearing.[13] That conclusion was supported by clear and convincing evidence that funds belonging to each of those clients were placed in the General Collections Account and never forwarded or returned to the client. Mr. Blatt garnished wages to collect debts on behalf of Ms. Mayer and Harvard Drug Group and received payments from debtors of the credit union with respect to debts they owed the credit union. All of those funds were placed in the General Collections Account, from which the firm, at Mr. Blatt's direction, "borrowed" money to meet operating expenses. Moreover, Mr. Blatt never supplied those clients with information as to when those funds were received, what portion of those funds had been withdrawn for attorney's fees, or how their money was utilized by the firm.

*Failing to Supervise Subordinates Properly*

We agree with the hearing judge that Mr. Blatt violated Rule 5.1(a) & (b) (responsibilities of partners, managers, and supervisory attorneys) and Rule 5.3(a), (b) & (c) (responsibilities regarding non-lawyer assistants).

Rule 5.1 states in pertinent part:

> (a) A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Maryland Lawyers' Rules of Professional Conduct.

---

[13] Mr. Blatt excepts to this conclusion and, essentially reiterating an earlier exception, contends that the General Collections Account was in fact a client trust account. For the same reasons articulated above, we overrule that exception.

(b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Maryland Lawyers' Rules of Professional Conduct.

The hearing judge found that Mr. Blatt was a principal at the Margolis firm, that he had direct supervisory authority over other attorneys, and that during the firm's representation of DKA, lawyers under Mr. Blatt's supervision allowed statutes of limitation to expire in three DKA subrogation matters.[14]

As a supervising attorney, Mr. Blatt had the duty to ensure that his firm took basic measures to make certain that the firm's attorneys conformed their conduct to the ethical rules governing attorneys. The "rules place the burden on partners or managing attorneys to ensure that their firm and staff are in compliance with their professional obligations." *Attorney Grievance Comm'n v. Shepard*, 444 Md. 299, 322 (2015). Here, it is apparent that Mr. Blatt failed to establish adequate controls to ensure that cases were timely filed and that clients received appropriate status updates about their cases. While the shortcomings of subordinate attorneys cannot always be attributed to a supervisor, it is evident that Mr. Blatt failed to have appropriate mechanisms, as required by Rule 5.1, to safeguard clients from incompetence or lack of diligence on the part of attorneys under his supervision.

---

[14] Mr. Blatt excepts to this conclusion on the basis that the DKA subrogation cases were not under his supervision, essentially repeating his exception to the hearing judge's fact finding that he had responsibility for those cases. For the same reasons set forth earlier, we overrule that exception.

Rule 5.3 concerns the responsibility of an attorney for misconduct by non-lawyers under the attorney's supervision.

Rule 5.3(a) requires that an attorney having managerial authority in a firm "make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance" that the conduct of employees of the firm is compatible with the attorney's professional obligations.

Rule 5.3(b) requires that an attorney with supervisory authority over a non-attorney "make reasonable efforts" to ensure that the employee's conduct is compatible with the attorney's professional obligations.

Rule 5.3(c)(1) states that: "a lawyer shall be responsible for conduct of such a person that would be a violation of the Maryland Lawyers' Rules of Professional Conduct if engaged in by a lawyer if: (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved."

Here, Mr. Blatt directed firm employees to transfer client funds out of the General Collections Account to be used for other purposes – an action incompatible with his professional obligations to his clients. Moreover, the General Collections Account was not properly designated an attorney trust account, and was not used in conformity with the rules governing such accounts. Mr. Blatt's misuse of client money was in violation of Rule 1.15 concerning the safeguarding of client property, for the reasons explained above. His

direction to non-attorney subordinates to engage in conduct that would violate Rule 1.15, if done by an attorney, was a violation of Rule 5.3.[15]

*Dishonesty*

We agree with the hearing judge that Mr. Blatt violated Rule 8.4(c), which prohibits a lawyer from engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation."[16]

The hearing judge found that Mr. Blatt violated Rule 8.4(c) in regard to his management of the client funds that were deposited into the General Collections Account. Such client funds included the funds garnished from debtors on behalf of Ms. Mayer and Harvard Drug Group, payments received from debtors of the credit union, and funds provided by DKA for court costs in cases that were never filed. Mr. Blatt failed to disburse, or return, those funds to the clients to whom they belonged, and participated in the transfer of $24,500 from that account to a new account at PNC Bank in his name on the theory that $24,500 represented legal fees owed to the firm. Based on the testimony of the firm's financial manager, the hearing judge found that the $24,500 was in fact money that belonged to the firm's clients, and did not consist of attorney's fees. This misappropriation violated Rule 8.4(c).

---

[15] Mr. Blatt excepts to this conclusion on the ground that the treatment of funds in the General Collections Account was not inconsistent with Rule 1.15, essentially incorporating his exception to the conclusion that he had violated the latter rule. For the same reasons explained earlier with respect to Rule 1.15, we overrule Mr. Blatt's exception.

[16] Mr. Blatt generally excepts to this conclusion, but does not elaborate.

*General Violations*

We agree with the hearing judge that Mr. Blatt's conduct as found by the hearing judge violated Rule 8.4(a) & (d).[17]  A lawyer who violates any of the MLRPC – as Mr. Blatt did here – by definition also violates Rule 8.4(a).  Conduct that prejudices the administration of justice violates Rule 8.4(d).

Mr. Blatt's failure to ensure that legal action he had taken on behalf of a client – *e.g.*, a garnishment on behalf of Harvard Drug Group – was conducted in accordance with statutory limitations on garnishment prejudiced the administration of justice in that proceeding.  Moreover, as the hearing judge found, his action and inaction during the decline of his firm indubitably brings the legal profession into disrepute and is prejudicial to the administration of justice.  *See Attorney Grievance Comm'n v. Park*, 427 Md. 180, 194 (2012).

### III

### Sanction

As this Court has repeatedly stated, "the purpose of a sanction in an attorney discipline case is not so much to punish the attorney, as it is to protect the public and deter future misconduct." *Attorney Grievance Comm'n v. Woolery*, 456 Md. 483, 497-98 (2017).  The sanction must take account of the facts and circumstances of the case.  *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 375 (2005).  The public is best "protected

---

[17] Mr. Blatt generally excepted to these conclusions, but did not elaborate beyond generally referencing his other exceptions.  Consistent with our previous rulings, we overrule these exceptions.

when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Grievance Comm'n v. Awuah*, 374 Md. 505, 526 (2003).

The Commission recommends disbarment of Mr. Blatt. As indicated above, Mr. Blatt has not conceded that his conduct violated the MLRPC in any respect. At oral argument, he declined to suggest an alternative sanction if we came to a different conclusion.

Misuse of client funds is very serious misconduct. "[A]n attorney's misappropriation of funds entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of professional misconduct." *Attorney Grievance Comm'n v. Pattison*, 292 Md. 599, 609 (1982). Because misappropriation of client funds is "an act infected with deceit and dishonesty," it ordinarily merits disbarment, absent compelling circumstances. *See Attorney Grievance Comm'n v. Zdravkovich*, 381 Md. 680, 704 (2004).

Mishandling of client funds and dishonest conduct are at the heart of this case. Mr. Blatt directed client funds into the General Collections Account, then used money from that account to pay the firm's expenses, and ultimately transferred some of those funds to an account at another bank in his own name to evade one of the firm's primary creditors – Revere Bank. All four of the clients spotlighted at the hearing of this case were victims of this practice. Mr. Blatt has apparently not reimbursed any of those clients for the funds that belonged to them.

27

It may be that Mr. Blatt intended to use the funds taken from the General Collections Account to support his collections practice for the benefit of his clients and to repay those funds when his practice had regained its footing. But attorneys are not permitted to "borrow" client funds, however admirable the purpose might be, without the client's knowledge and permission.[18]

We thus start from the premise that disbarment is the appropriate sanction and consider any aggravating and mitigating factors in deciding whether to deviate from that benchmark.[19] A respondent in an attorney disciplinary action has the burden of proving any matter of mitigation by a preponderance of the evidence. Maryland Rule 19-727(c).

---

[18] And even the client's knowledge and permission may not be enough to comply with the ethical rules governing attorneys. *See, e.g.,* Rule 1.8(a) (requiring attorney who enters into business transaction with a client to advise the client in writing of the desirability of the client obtaining independent legal advice).

[19] The American Bar Association has recommended consideration of the following mitigating and aggravating factors:

**Aggravating factors**

(a) prior disciplinary offenses;
(b) dishonest or selfish motive;
(c) a pattern of misconduct;
(d) multiple offenses;
(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of the victim;
(i) substantial experience in the practice of law;
(j) indifference to making restitution; and
(k) illegal conduct, including that involving the use of controlled substances.

28

The hearing judge found two aggravating factors in this case: (1) Mr. Blatt's failure to make restitution or accept responsibility for the misappropriation of client funds, and (2) a pattern of misconduct.[20] It is also apparent that, as a member of the bar for more than 40

---

**Mitigating factors**

(a)   absence of a prior disciplinary record;
(b)   absence of a dishonest or selfish motive;
(c)   personal or emotional problems;
(d)   timely good faith efforts to make restitution or to rectify consequences of misconduct;
(e)   full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
(f)   inexperience in the practice of law;
(g)   character or reputation;
(h)   physical disability;
(i)   mental disability or chemical dependency including alcoholism or drug abuse when:
    (1)   there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
    (2)   the chemical dependency or mental disability caused the misconduct;
    (3)   the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
    (4)   the recovery arrested the misconduct and recurrence of that misconduct is unlikely.
(j)   delay in disciplinary proceedings;
(k)   imposition of other penalties or sanctions;
(l)   remorse; and
(m)   remoteness of prior offenses.

*See* American Bar Association, *ABA Compendium of Professional Responsibility Rules and Standards* (2017), §§9.22, 9.32 at pp. 463-64.

[20] Mr. Blatt excepts to both of these findings generally on the ground that he should not be held personally responsible for actions taken by subordinates. As set forth earlier

years, Mr. Blatt has substantial experience in the practice of law, which is also considered an aggravating factor.

The hearing judge did not analyze whether any mitigating factors applied to Mr. Blatt's misconduct, other than to note that he had not been previously disciplined.

In cases involving dishonesty and intentional misappropriation, this Court has indicated that it will accept, as "compelling extenuating circumstances" that justify a sanction short of disbarment, only "the most serious and utterly debilitating mental or physical health conditions" that are the "root cause" of the misconduct. *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 413-14 (2001). In his testimony at the hearing, Mr. Blatt to some extent blamed his misconduct on various health issues that, he said, impeded his ability to oversee his practice during the period of the firm's decline. That testimony did not even purport to meet the *Vanderlinde* standard. In any event, the hearing judge did not credit Mr. Blatt's testimony to the extent that he was specific as to how his health issues related to the misuse of client funds and the failure to supervise subordinates adequately. We have no basis for concluding that the hearing judge was

---

in this opinion, we have rejected Mr. Blatt's effort to disclaim responsibility for the actions of his subordinates.

Mr. Blatt also excepts specifically to the finding that he engaged in a pattern of misconduct, asserting that the conduct took place during a short period of time when his firm was collapsing. It is true that the misconduct found by the hearing judge occurred over the course of one year of Mr. Blatt's career, which has spanned more than 45 years. Yet the misconduct over the course of that year was not an isolated incident.

clearly erroneous in this regard. *See Attorney Grievance Comm'n v. Weiss*, 389 Md. 531, 545 (2005).

In sum, the appropriate sanction in this case is disbarment.

> **IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS PURSUANT TO MARYLAND RULE 19-709(D), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST STUART RICHARD BLATT.**