*Attorney Grievance Commission of Maryland v. Raj Sanjeet Singh*
Misc. Docket AG No. 6, September Term 2018


**Attorney Discipline – Diligence and Communication with Client – Conflict of Interest Settlement with Client – Attorney Trust Account – Suspension.** An attorney successfully represented an immigrant and his spouse (a United States citizen) in obtaining conditional permanent resident status for the immigrant, for a two-year period, based on their recent marriage. The immigrant and his spouse later experienced marital difficulties. The attorney failed to communicate appropriately and to act diligently in advising the immigrant as to his options in removing the conditions on his permanent resident status before the expiration of the two-year period. Given his prior representation of both spouses, the attorney had a conflict of interest when he undertook to advise the immigrant whether he could bring criminal charges against the spouse. After the immigrant sent a complaint to Bar Counsel about a fee dispute with the attorney, the attorney refunded the legal fee to the client in return for a release without advising the client to seek independent advice concerning the release. During Bar Counsel's investigation of this matter, the attorney gave a misleading statement under oath about whether he usually complied with the rules requiring deposit of client funds in an attorney trust account. A later review of his bank records revealed his non-compliance with those rules. However, there was no evidence of misappropriation of client funds or other client harm. Under these circumstances, a 60-day suspension is the appropriate sanction.
Maryland Attorneys' Rules of Professional Conduct, 19-301.3, 19-301.4, 19-301.7, 19-301.8, 19-301.15, 19-308.1 & 19-308.4 (formerly Maryland Lawyers' Rules of Professional Conduct 1.3, 1.4, 1.7, 1.8, 1.15, 8.1 & 8.4); Maryland Rule 19-404 (formerly Maryland Rule 16-604).

Circuit Court for Montgomery County
Case No. 448654-V
Argument: February 28, 2019

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 6

September Term, 2018

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

V.

RAJ SANJEET SINGH

_____

Barbera, C.J.
*Greene
McDonald
Watts
Hotten
Getty,
Adkins, Sally D. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by McDonald, J.
Greene, Watts, and Hotten, JJ., dissent.

_____

Filed: July 17, 2019

*Greene, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to the Maryland Constitution, Article
IV, Section 3A, he also participated in the
decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The phrase "no harm, no foul" derives from the idea that, if a foul committed in a basketball game does not affect the outcome, the referee should not call the foul.[1] It denotes harmless error in a sports context. The rules of professional conduct governing attorneys do not allow us to adopt that approach. Many of those rules are prophylactic in nature. We must call a foul when one is committed, although the severity of the harm – or a lack of harm – may affect the sanction.

Respondent Raj Sanjeet Singh is a Maryland attorney who primarily practices immigration law from an office in Montgomery County. In 2014, Mr. Singh successfully represented an immigrant and the immigrant's spouse, who was a United States citizen, in obtaining conditional permanent resident status for the immigrant for a two-year period based on their recent marriage. Mr. Singh advised them to return to him well before that status expired in order to remove the conditions and the time limit.

The immigrant and the spouse later experienced marital difficulties. Mr. Singh failed to respond promptly to the immigrant's inquiries concerning his options as to permanent resident status. When Mr. Singh acceded to the immigrant's request in 2016 that he research potential criminal charges against the spouse, Mr. Singh had a conflict of interest based on his prior representation of both spouses. A fee dispute also ensued, and the immigrant filed a complaint with Bar Counsel.

---

[1] *The Proverbial Game: 'The Dictionary of Modern Proverbs' Uncovers the Origins of Sporting Terms* (Yale Books Blog, June 8, 2012), https://perma.cc/5SUE-T5CT.

In response, Mr. Singh gave a refund to the immigrant and forwarded to Bar Counsel a release from the client that did not comply with the ethical rule governing attorney settlements with clients. During the course of Bar Counsel's investigation, Mr. Singh also made a misleading statement under oath concerning his general compliance with the rules requiring deposit of client funds in an attorney trust account.

In the end, there was no evidence of misappropriation or any indication that client funds were used other than for their intended purpose. The immigrant ultimately obtained unconditional permanent resident status, apparently using the strategy proposed by Mr. Singh. While no one may have suffered harm from Mr. Singh's violations of the ethical rules, those rules are designed to ensure that attorneys are conscientious in their representation of clients and do not take advantage of them. Even in the absence of harm, we cannot ignore the foul. Given the context of Mr. Singh's otherwise unblemished career and successful representation of this client, the appropriate sanction for these violations is suspension for 60 days.

# I

## Background

### A. *Procedural Context*

On May 24, 2018, the Attorney Grievance Commission ("Commission"), through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Mr. Singh, alleging that he had violated numerous provisions of the rules of professional conduct.[2]

---

[2] During much of the period relevant to this case, the ethical rules governing attorneys were entitled the Maryland Lawyers' Rules of Professional Conduct ("MLRPC")

These included alleged violations of Rule 1.1 (competence); Rule 1.2 (scope of representation); Rule 1.3 (diligence); Rule 1.4 (communication); Rule 1.5 (reasonableness of fees); Rule 1.7 (conflict of interest – generally); Rule 1.8 (conflict of interest – specific rules); Rule 1.9 (duties to former clients); Rule 1.15 (safekeeping property); Rule 8.1 (false statement in connection with a disciplinary matter); Rule 8.4 (misconduct); as well as violations of Maryland Rules 19-404 (trust account – deposits) and 19-407 (trust account recordkeeping). Bar Counsel later withdrew the charges pertaining to the reasonableness of fees and trust account recordkeeping.

Pursuant to Rule 19-722(a), we designated Judge Kevin G. Hessler of the Circuit Court for Montgomery County to conduct a hearing concerning the alleged violations and to provide findings of fact and conclusions of law. Following a hearing in October 2018, the hearing judge concluded that Mr. Singh had violated Rule 1.3, Rule 1.4, Rule 1.7, Rule 1.8, Rule 1.15(a) & (c), Rule 8.1, Rule 8.4(a), (c), & (d), and Maryland Rule 19-404. The hearing judge concluded that there was insufficient evidence of violations of Rule 1.1, Rule 1.2, and Rule 1.9.

---

and were codified in an appendix to Maryland Rule 16-812. Effective July 1, 2016, the MLRPC were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and recodified in Title 19 of the Maryland Rules with the term "attorney" substituted for the term "lawyer." *See* Maryland Rules 19-300.1 *et seq.* For simplicity, in this opinion, we shall use the shorter designations of the MLRPC – *e.g.*, "Rule 8.4" rather than "Maryland Rule 19-308.4." As part of the same recodification, certain rules relating to attorney trust accounts that appeared in Title 16 of the Maryland Rules were transferred to Title 19. We shall use the current codification of those rules in this opinion.

Bar Counsel did not except to the hearing judge's findings or conclusions other than in minor respects.[3] Mr. Singh filed a number of exceptions. In particular, Mr. Singh took issue with the hearing judge's conclusions concerning the alleged violations of Rule 1.3, Rule 1.4, Rule 1.7, Rule 1.8, Rule 8.1, and Rule 8.4. Mr. Singh conceded, as he had at the hearing, that he had violated Rule 1.15 concerning safekeeping of client funds and Maryland Rule 19-404 concerning required deposits in his attorney trust account.

**B.     *Facts***

When no exception is made to a hearing judge's finding of fact, we accept it as established. Maryland Rule 19-741(b)(2)(A). When a party excepts to a finding, we must determine whether the finding is established by the requisite standard of proof – in the case of an allegation of misconduct, clear and convincing evidence. Maryland Rules 19-741(b)(2)(B), 19-727(c). We summarize below the hearing judge's findings and other undisputed matters in the record. We address any exceptions in relation to the findings to which they pertain.

---

[3] Bar Counsel noted certain typographical errors or discrepancies in the hearing judge's conclusions of law relating to Rules 1.4 and 1.7. Bar Counsel also observed that the finding of a violation of Rule 8.1(a) (false statement in connection with a disciplinary matter) could not be based on testimony that Mr. Singh gave at the hearing of this matter as that conduct was not the basis of the charges in the petition and, accordingly, Mr. Singh had not received the requisite notice to defend against such a charge. *See In re Ruffalo*, 390 U.S. 544, 551 (1968); *Attorney Grievance Comm'n v. Patton*, 432 Md. 359, 378 (2013). Bar Counsel further observed, however, that any such false statements could be considered aggravating circumstances for purposes of a sanction. There appears to be no dispute as to these exceptions, at least one of which is to Ms. Singh's benefit. Accordingly, we sustain those exceptions and have incorporated them in this opinion.

4

*Mr. Singh's Credentials and Practice*

Mr. Singh has been a member of the Maryland Bar since 1998. He graduated from the University of Maryland with a degree in accounting and earned his law degree from the University of Richmond Law School. He initially worked at PriceWaterhouseCoopers before starting his own law firm in Montgomery County in 2000. As a solo practitioner, he has focused his practice primarily on immigration law, although he has also worked on family law matters and business transactions. His immigration practice consists of family immigration, asylum applications, and deportation defense matters. During the period relevant to this case, he employed a legal assistant, Linda Villanueva, who is fluent in Spanish as well as English.

*Mr. A – a Client with an Immigration Issue*

This case grew out of Mr. Singh's representation of an individual who we shall refer to as Mr. A,[4] an immigrant from Brazil. Mr. A was born in Americana, Brazil, in 1984 and came to the United States in January 2007 on a J-1 cultural exchange visa. Since coming to the United States, Mr. A has held a variety of jobs at fast food restaurants, pizzerias, and delivery and ride hailing services.

Mr. A speaks Portuguese, Spanish, and some English, although he is not fully comfortable in English. He testified through a translator at the hearing of this case,

---

[4] Because the underlying immigration matter involved relief based on allegations of domestic violence, federal law imposes certain confidentiality obligations on federal officials. *See* 8 U.S.C. §1367. Consistent with the intent of that statute, in this opinion we will refer to Mr. Singh's client and his spouse by initials instead of their names.

although he was able to discuss exhibits that were in English – some written by Mr. A himself.  At Mr. Singh's office, Ms. Villanueva sometimes functioned as a translator, speaking with Mr. A in Spanish, and then repeating the substance in English for Mr. Singh.

On March 14, 2014, Mr. A married Mr. J, a citizen of the United States whom he had met in 2010 and who lived in Alexandria, Virginia.  At the time of the marriage, Mr. A's visa was no longer valid.  To address Mr. A's immigration status, Mr. A and Mr. J sought Mr. Singh's assistance.

*Applying for and Obtaining a Conditional Green Card for Mr. A*

On April 1, 2014, Mr. A met with Mr. Singh at his office.  Mr. Singh agreed to represent Mr. A and his spouse in the effort to obtain permanent resident status for Mr. A, and the accompanying documentation, commonly known as a "green card."[5]  Mr. Singh obtained relevant information from Mr. A and Mr. J in order to file an I-130 petition ("Petition for Alien Relative") by Mr. J, an I-485 form ("Application to Register Permanent Residence") by Mr. A, and related forms with the United States Citizenship and Immigration Services ("USCIS").[6]

---

[5] There was some dispute at the hearing as to whether the 2014 agreement provided for Mr. Singh to assist Mr. A in obtaining citizenship (Mr. A's version) or just a green card (Mr. Singh's version).  Mr. Singh testified that Mr. A signed a retainer agreement for this representation, but he was unable to locate the agreement in his records.  The hearing judge found that there was insufficient evidence to conclude that Mr. Singh had agreed to do more than assist with the application for a green card.

[6] The submission also included two G-28 forms (notifying the agency of Mr. Singh's representation of Mr. A and Mr. J respectively); an I-864 affidavit (by Mr. J documenting his financial ability to support Mr. A); an I-765 form (requesting employment authorization for Mr. A); an I-131 form (seeking authorization for Mr. A to return to the United States

On May 15, 2014, Mr. Singh met with both Mr. A and Mr. J to ensure that the documents were complete and accurate. That same day, he mailed to USCIS the relevant immigration forms, as well as tax transcripts, birth certificates, Mr. A's passport and medical examination results, and their marriage license. In connection with that filing, Mr. Singh entered his appearance as attorney on behalf of both spouses. Mr. Singh followed up with additional documentation requested by USCIS. In August 2014, USCIS approved Mr. A's authorization for employment and also advised him that he and Mr. J had been scheduled for an interview on October 2, 2014.

In September 2014, Mr. A and Mr. J met with Mr. Singh in his office to prepare for their USCIS interview. Mr. Singh advised them as to the types of questions they would be asked during the interview and they reviewed their answers with him. Mr. Singh did not accompany them to the interview.

Shortly after the USCIS interview on October 2, 2014, Mr. A received a conditional green card with an expiration date two years hence – October 2, 2016. Mr. A's permanent resident status was conditional because the marriage was less than two years old at the time of application. USCIS advised Mr. A to apply for removal of the conditions several months before his conditional green card would expire. Mr. Singh told Mr. A and Mr. J to contact him three to six months before the expiration date for the purpose of preparing an I-751 form ("Petition to Remove Conditions on Residence").

---

after foreign travel while his application was pending); and a G-325 form (containing biographical information for both spouses).

As we shall see, Mr. A eventually was able to remove the conditions from his green card, but neither the marriage nor the attorney-client relationship lasted to that time.

*The Breakdown of Mr. A's Marriage*

In 2015, approximately one year into the marriage, Mr. A and Mr. J began to experience marital problems. According to Mr. A, he believed that he was being abused by Mr. J.[7] At some point during that year, Mr. A contacted Mr. Singh to ask how a separation or divorce would affect his ability to remove the conditions on his green card.

During the fall of 2015, Mr. Singh discussed with Mr. A the possibility that Mr. A could file an I-751 petition by himself without Mr. J's cooperation, based on a law that authorizes the filing of a solo petition in circumstances of domestic abuse.[8] To succeed on such a petition, Mr. A would have to establish that the marriage had been contracted in

---

[7] According to copies of emails, texts, and social media entries that Mr. A sent to Mr. Singh, Mr. A was bothered by the deteriorating hygiene and cleanliness of Mr. J, and by the fact that he paid rent to Mr. J after moving in with him. Mr. J in turn was frustrated that Mr. A tended to work at night and also became suspicious of some of Mr. A's activities. According to documents sent by Mr. A, Mr. J created a fake social media profile, with Mr. A's name and photo, in which Mr. A supposedly confessed to infidelity. Mr. A also said that Mr. J had communicated with Mr. A's Brazilian relatives on false pretenses during which, contrary to Mr. A's wishes, he disclosed Mr. A's sexual orientation. In those communications, Mr. J complained about Mr. A not wearing his wedding band, Mr. A failing to pay his fair share for their Hawaii honeymoon, and the absence of intimate relations. According to Ms. Villanueva, Mr. Singh's legal assistant, Mr. A called Mr. Singh's office frequently during 2015 and 2016 and discussed with her many of the details of these issues.

[8] Linda Dominguez, an expert in immigration law who was called by Mr. Singh as a witness at the hearing, testified that the federal Violence Against Women Act allows for an I-751 petition to be filed without the participation or knowledge of the citizen spouse in those circumstances.

good faith, that the spouses resided together for a period of time, and that the immigrant spouse was subject to battery or extreme cruelty by the citizen spouse. *See* 8 U.S.C. §1154(a)(1)(A)(iii). Mr. Singh advised Mr. A on the type of evidence and documentation that he would need for such a petition. He also told Mr. A to contact the police if he felt afraid.

In December 2015, Mr. A moved out of Mr. J's home in Virginia and advised Mr. Singh that he had done so. Mr. Singh told Mr. A to consult with a Virginia attorney concerning his domestic relations issues. Mr. A responded that he did not know or trust anyone in Virginia and insisted on continuing to consult with Mr. Singh. From the time he left Mr. J's home in December 2015 through early March 2016, Mr. A sent Mr. Singh more than 100 pages of emails, texts, and social media entries relating to the alleged abuse by Mr. J. As of that time, Mr. A had not formally retained Mr. Singh (or paid him) to represent Mr. A with respect to removing the conditions on his green card.

*The Breakdown of the Attorney-Client Relationship*

Sometime during the spring of 2016, Mr. A met with Mr. Singh at his office.[9] At the meeting Mr. A paid Mr. Singh $900 for legal services in the form of a series of post-dated checks.[10] These were the first payments Mr. Singh had received from Mr. A since

---

[9] There appears to be some dispute about the exact date of this meeting. Mr. Singh testified that it occurred during April, Bar Counsel placed it on May 31, and the hearing judge apparently split the difference, finding that it likely occurred on May 1, as represented in a fee dispute complaint later filed by Mr. A with the Maryland State Bar Association.

[10] There were four checks dated as of the last day of May, June, July, and August 2016, respectively. According to Ms. Villanueva, the firm would accept multiple post-

2014. Both Mr. Singh and Ms. Villanueva testified that there was an executed retainer agreement in connection with the $900 payment but they had not been able to locate it. Mr. A testified that no retainer agreement was executed at that meeting. There is also a dispute as to what services were to be covered by the $900 payment.

Mr. Singh testified that Mr. A paid him $900 to review the voluminous documents Mr. A sent concerning the alleged abuse, to do research as to Mr. A's immigration options, and to investigate the possibility of pursuing criminal cyberstalking charges against Mr. J in Virginia for certain online conduct. Mr. Singh testified that although he and Mr. A discussed the possibility of Mr. A eventually filing a solo I-751 petition and the importance of Mr. A documenting Mr. J's abusive behavior for that purpose, he had not agreed to represent Mr. A in such a petition and the $900 payment was not for that purpose.[11]

According to Mr. A, Mr. Singh agreed to begin working on his solo I-751 petition at the spring 2016 meeting and the $900 payment was for that purpose. Mr. A thought that the cyberstalking research was a part of the work for the petition.

In his discussion of his conclusions of law, the hearing judge found that there was not clear and convincing evidence that Mr. Singh was retained in the spring of 2016 to do

_____

dated signed checks from clients as a sort of installment payment plan, under which the firm periodically completed and deposited a check. She said that, before depositing a check, the firm would always contact the client to confirm the payment.

[11] In that regard, Mr. Singh stated that he would have charged $2,500 to $2,700 to represent Mr. A on a solo petition, in addition to approximately $600 for the required filing fees. The hearing judge noted, however, that the $900 payment could be viewed as consistent with Mr. Singh's practice of requiring clients to pay one-third of his fee up front before he would begin work on a matter.

more than research possible criminal charges against Mr. J and provide advice on Mr. A's options for removing the conditions on his green card.

Mr. Singh did not meet again with Mr. A until September 14, 2016. In the interim, Mr. A sent more documentation to Mr. Singh and called Mr. Singh's office numerous times. According to Mr. A, Mr. Singh's office was largely non-responsive. Mr. Singh testified that he spoke with Mr. A on two or more occasions and had advised him of the results of his cyberstalking research. According to Ms. Villanueva, she also spent significant time speaking with Mr. A on the phone. The hearing judge noted that, according to Mr. Singh, Mr. A was considering whether to reconcile with Mr. J and did not decide to proceed with the solo I-751 petition based on domestic abuse until Mr. A received an email from Mr. J in August 2016 stating that Mr. J was planning to be remarried to someone else. However, in his discussion of his conclusions of law, the hearing judge credited Mr. A's testimony that he was not considering reconciliation with Mr. J after the spring 2016 meeting and had wished to pursue a solo I-751 petition from at least that time.

Mr. A met with Mr. Singh on September 14, 2016 to discuss a solo I-751 petition. At that meeting, Mr. A signed a consultation agreement and paid Mr. Singh a fee of $150 – the amount required under that agreement for a one-hour consultation. According to Mr. Singh, he told Mr. A at that meeting that he would charge Mr. A $2,700 to represent him in connection with the solo I-751 petition. Mr. Singh declined Mr. A's request that the $900 previously paid by Mr. A be applied against the $2,700 fee. Mr. A later testified at the hearing that he did not understand the difference between a retainer fee and a

consultation fee and believed that the $150 payment was for work on the solo I-751 petition.

In connection with the solo I-751 petition, Mr. Singh suggested that Mr. A see a psychologist for an evaluation concerning the alleged abuse and that Mr. A prepare a written summary of the abuse for that purpose.[12] Mr. A completed the summary on the day of their meeting and forwarded it to Mr. Singh, who found the rambling narrative difficult to follow and enlisted Ms. Villanueva to assist Mr. A in revising it. Later, Mr. Singh reviewed and edited the final version and forwarded it to the psychologist to whom he had referred Mr. A. On September 22, 2016, Mr. A met with the psychologist. Mr. A paid the psychologist $1,500 for the evaluation plus $300 to expedite the report of the evaluation, in light of the impending October 2 expiration of his conditional green card.

In the psychologist's evaluation report, issued a few days after meeting with Mr. A, the psychologist found that while "[Mr. A] does not fully meet criterion A[13] for a DSM-5 diagnosis of [post-traumatic stress disorder] … his presentation and constellation of symptoms meet the requirements for all other criteria, which clearly indicate that he has experienced significant trauma based on emotional cruelty."

---

[12] Mr. Singh and Mr. A disagreed in their testimony concerning the timing of this suggestion. Mr. Singh testified that he made the suggestion prior to September 2016, but that Mr. A did not act on it until after the September meeting. Mr. A claims that he first learned of that suggestion at the September meeting.

[13] According to the report, "criterion A" involves "exposure to actual or threatened death, serious injury or sexual violence" in certain listed ways.

Mr. Singh and Mr. A spoke by telephone after the psychologist issued the evaluation report and discussed the fee for Mr. Singh to complete I-751 petition filing process. Mr. A again requested that his previous $900 payment be applied to the cost of the I-751 petition filing. Mr. Singh again declined to apply the $900 – which he said had been expended on the Virginia cyberstalking research – towards the $2,700 legal fee or $600 filing fees.

No petition was filed by the time Mr. A's conditional green card expired on October 2, 2016. Mr. Singh admitted at the hearing that Mr. A lost his work authorization as of that date, that he could have been placed in deportation proceedings, and that he would have been unable to return to this country if he had traveled outside the United States. On the other hand, both Mr. A and Mr. Singh testified that Mr. Singh had advised Mr. A that it was more important to send in a complete application with all the relevant materials than to simply meet the October 2, 2016 deadline. An immigration law expert called as a witness by Mr. Singh agreed that filing a complete package with the I-751 petition was of primary importance. She stated that the I-751 petition could still be filed after expiration of the conditional green card, that she had never seen a petition denied for failing to be filed before that date, and that the most significant practical consequence of missing the deadline was the limitation on travel outside the country.

Mr. Singh and Mr. A had arranged to meet again on October 6, 2016. However, on that morning, Mr. A texted Mr. Singh, "Hi, Raj. This is [Mr. A]. I can't make it today. I have to reschedule to stop by office. Probably next week I can stop by. Thanks." A week later, Mr. Singh sent a letter to Mr. A stating that he was closing Mr. A's file and

terminating his representation because "much of my advice has been ignored, and you have not done the necessary things in order to advance the process in a timely manner." The letter also referred to "an apparent miscommunication from you towards our office team whereby you have claimed that fees you paid for research of potential criminal charges against your spouse, should have been applied to . . . an application to remove conditions on your conditional resident status." Mr. Singh also wrote that he had heard from the psychologist that Mr. A was working with other counsel and offered to send his file to successor counsel.

That same day, Mr. A responded in an email to Ms. Villanueva that "you charge me 900 dollars only to read my spouse message and that's it." He also wrote that Mr. Singh "didn't even filed my petition for 90 days before my visa expires, which you supposedly should be done a long time ago, and now my visa is expired and now I can't work nowhere because you late to file my petition." At the end of his email, Mr. A again requested a refund of his $900 payment. In another email a few days later, Mr. A reiterated his request for a refund and asked for the return of his documents. Mr. A received no immediate response to that email.

*A Complaint to Bar Counsel, a Refund, and a Release*

On November 17, 2016, Mr. A filed a fee dispute complaint with the Maryland State Bar Association, which apparently was forwarded to Bar Counsel. In that complaint, Mr. A asserted that Mr. Singh had misled him as to the purpose of the $900 payment and that Mr. Singh had not diligently pursued a solo I-751 petition on Mr. A's behalf. On December 2, 2016, Bar Counsel forwarded the complaint to Mr. Singh with a request that he respond

14

within 15 days. Upon receiving that communication, Mr. Singh directed Ms. Villanueva to refund Mr. A the $900 that Mr. A had requested.[14] She prepared a check in that amount, which Mr. Singh signed.

Ms. Villanueva contacted Mr. A, who came to the firm's office to pick up his $900 check on December 12, 2016. At that time, Ms. Villanueva had Mr. A sign a release, which read as follows:

> I, [Mr. A] in return for $900 tendered on this 12th day of December 2016, hereby waive and release Attorney Raj S. Singh and his law office from any further professional responsibility or liability in the matter of my application to remove conditions on my residency in the United States.
>
> I also agree to withdraw any claims or grievances that are pending and agree to release him from any liability in this regard.

Mr. A signed the release, which was notarized by Ms. Villanueva, and received the check.

Two days later, in a timely response to Bar Counsel's letter that had requested a reaction to Mr. A's complaint, Mr. Singh sent a copy of the release to Bar Counsel. In a cover letter, he wrote that "this matter has been resolved between the parties" and summarized briefly his view of the history and purpose of the $900 payment.

There was some dispute in the testimony at the hearing as to how Mr. A came to execute the release. Mr. A testified that the release had already been prepared when he arrived at Mr. Singh's office and that Ms. Villanueva "said the check was available, but I

---

[14] According to Mr. Singh, he decided to make the refund because he could not locate the retainer agreement that he believed documented the purpose of the $900 payment.

had to sign a contract before I get the check." He testified that, after signing the release and receiving the check, he told Ms. Villanueva he wanted to withdraw the complaint against Mr. Singh "because I thought that was the best way to resolve this."

Ms. Villanueva and Mr. Singh presented a slightly different narrative at the hearing. Ms. Villanueva testified that, after Mr. A expressed his regret over filing the complaint against Mr. Singh, she decided to document his change of heart and drafted the release. Both Ms. Villanueva and Mr. Singh testified that Mr. Singh was not aware of the release before it was signed.

This testimony appeared to be somewhat at odds with a letter Mr. Singh's then-counsel had sent to Bar Counsel in March 2017 concerning Mr. A's complaint. In that letter, counsel stated:

> When he returned the fee, Mr. Singh had [Mr. A] sign a Release. At that time, he was not aware of the dictates of [Rule] 1.8(h)(2), and therefore did not advise [Mr. A] in writing of his right and the desirability of seeking independent counsel. During the conversation with [Mr. A] in which Mr. Singh advised that he would return the fee, Mr. Singh got the impression that [Mr. A] was in contact with other counsel and therefore he did not specifically advise him to seek independent counsel.

Counsel stated further that Mr. Singh would not enforce the release and considered it to be void. Mr. Singh had also signed his counsel's letter, certifying that the events it recounted were "true and correct." Later, on cross-examination at the hearing, Mr. Singh explained that he had signed the March 2017 letter because "I was advised by my then-attorney that I had to take responsibility for the actions of my staff. They were my agents."

16

The hearing judge found by clear and convincing evidence that it was Mr. Singh's idea to have Mr. A execute a release.[15]  In any event, there is no dispute that Mr. Singh made use of the release shortly after it was executed in an effort to truncate Bar Counsel's investigation of Mr. A's complaint.  Critically, there is no dispute that Mr. Singh failed to advise Mr. A, then or later, in writing or orally, that it was advisable for him to seek independent legal counsel in connection with a release of liability.

*Required Deposits to Trust Account*

Mr. Singh's clients were at times required to advance funds for payment of filing fees – client funds that should be held in an attorney trust account until paid for that purpose.  In a May 2017 investigative deposition of Mr. Singh taken by Bar Counsel in connection with Mr. A's complaint, Mr. Singh admitted that he had paid fees to USCIS for filings on behalf of Mr. A out of his operating account.  Mr. Singh explained that he did not typically write checks drawn on his attorney trust account, but instead transferred funds from the trust account to his operating account before writing a check on the operating account to pay filing fees.

To follow up on Mr. Singh's statement, Bar Counsel issued a subpoena for records of Mr. Singh's bank accounts for a three-year period (April 2014 – May 2017).  An investigator for Bar Counsel reviewed those records and found that Mr. Singh had

---

[15] Mr. Singh excepted to this conclusion.  We overrule that exception.  The hearing judge is entitled to significant deference in assessing the credibility of witnesses and "picking and choosing" among the evidence presented and the inferences to be drawn from that evidence.  *See Attorney Grievance Comm'n v. Page*, 430 Md. 602, 627 (2013).

deposited client money for filing fees directly into his operating account in connection with 25 client matters; she found only five matters in which such funds were first deposited in the trust account and then transferred to the operating account for payment of filing fees.[16]

In his testimony at the hearing, Mr. Singh admitted that his deposition statement concerning his "usual" practice was incorrect, and that he had failed to comply with the rules concerning required deposits in attorney trust accounts. He stated that he had hired a forensic accountant to identify and clean up any further issues with client funds that had not been placed in a trust account, and that he now always places client funds intended for filing fees in a trust account. No evidence was presented that any of Mr. Singh's clients had been harmed by his failure to comply with the rules governing trust accounts and client funds.

*Epilogue*

Mr. A retained successor counsel to pursue his solo I-751 petition and the removal of conditions from his green card and was successful in doing so, based on the same approach Mr. Singh had recommended and begun to execute.

## II

### Discussion

We review a hearing judge's conclusions of law *de novo*. Maryland Rule 19-741(b)(1). We consider any exceptions as part of that review.

---

[16] Even in those instances, there was some delay in the payment of the funds for the filing fees.

The hearing judge did not find clear and convincing evidence that Mr. Singh violated Rule 1.1 (competence), Rule 1.2 (scope of representation), or Rule 1.9 (duties to former clients).  Although we are not precluded from reaching different conclusions from those of the hearing judge, Bar Counsel has not excepted to the hearing judge's conclusions concerning these alleged violations and we will not further address them.  *Attorney Grievance Comm'n v. Allenbaugh*, 450 Md. 250, 255 n.4 (2016).

We consider the remaining violations as falling into four categories:  (1) violations that relate generally to the attorney-client relationship between Mr. Singh and Mr. A during May through September 2016; (2) a conflict of interest that may have limited Mr. Singh's research into potential criminal charges against Mr. J in 2016 as a result of his prior joint representation of Mr. A and Mr. J in 2014; (3) a violation arising from the release executed by Mr. A on December 12, 2016, in exchange for the $900 refund; and (4) violations related to Mr. Singh's failure to comply, during the period 2014 through 2017, with the rules requiring deposit of client funds in a trust account.[17]

## A.    *Violations Relating to 2016 Attorney-Client Relationship with Mr. A*

*Rule 1.3 (Diligence)*

Rule 1.3 states that "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

---

[17] Rule 8.4(a) states that it is professional misconduct to violate any of the ethical rules.  Our conclusion that Mr. Singh violated some of the rules as alleged necessarily triggers the conclusion that he violated that rule as well.  Further analysis with respect to Rule 8.4(a) is unnecessary.

There is no contention that Mr. Singh violated this rule with respect to his representation of Mr. A and Mr. J in 2014 in the filing of the I-130 petition and the effort to obtain a conditional green card for Mr. A. Nor is there any contention that he violated this rule when, beginning in September 2016, he initiated the process for pursuing a solo I-751 petition on Mr. A's behalf to remove the conditions on his green card. Rather, the question is whether Mr. Singh was sufficiently diligent in his representation of Mr. A in the interim – specifically, during the period between May 2016 and September 2016.

As the hearing judge found, after the success in obtaining a conditional green card for Mr. A, Mr. Singh told Mr. A and Mr. J to contact him three to six months before the green card expired in October 2016 – *i.e.*, sometime between early April and early July 2016 – so that they could begin the process of removing the conditions. In fact, Mr. A contacted Mr. Singh much earlier, during 2015, concerning his troubled marital relationship. But Mr. A and Mr. Singh did not actually meet again, and Mr. A did not retain Mr. Singh for additional legal services, until the spring of 2016.

The hearing judge found that, in May 2016, Mr. Singh agreed to conduct some research as to potential criminal charges against Mr. J and to advise Mr. A as to his options in removing the conditions from his green card. The hearing judge found that Mr. Singh did not present Mr. A with the results of his research and the option to pursue a solo I-751 petition until their subsequent meeting in September 2016. That was well after the time Mr. Singh had originally advised that they should start the process for removing the conditions from Mr. A's green card and only a few weeks before its expiration. The hearing judge concluded that Mr. Singh did not act with reasonable diligence in advising Mr. A

concerning his options before the expiration of the green card and therefore violated Rule 1.3.

Mr. Singh excepts to this conclusion. He argues that the expiration date of Mr. A's green card was only a soft deadline for filing an I-751 petition, citing his expert's testimony that it is more important to file a complete I-751 petition than a "timely" one. He also points to the uncompensated time he and Ms. Villanueva spent responding to the many communications that his office received from Mr. A during 2015 and 2016. He contends that Mr. A's failure to follow through after their September 2016 meeting was primarily responsible for any delay in removing the conditions from his green card. Finally, he states that Mr. A suffered no actual prejudice, as he ultimately was able to remove the conditions on his green card, based in part on the work and advice of Mr. Singh.

While many of Mr. Singh's contentions appear to be true, they do not negate the finding of a violation of Rule 1.3. For example, while it is true that Mr. A could (and in fact did) succeed in removing conditions on his green card even though the I-751 petition was filed after the expiration of the green card, it is also true, as Mr. Singh's own expert testified, that Mr. A could have faced potentially significant consequences from the expiration of his green card on October 2, 2016.[18] Mr. Singh himself recognized the urgency of the situation when he expedited the psychological evaluation of Mr. A in September 2016. The fact that there was ultimately a happy ending for Mr. A does not

---

[18] The expiration of the green card resulted in the loss of Mr. A's work authorization, as well as his authorization to return to the United States after foreign travel, and rendered him subject to deportation proceedings.

mean that Mr. Singh acted diligently. To the extent that some of Mr. Singh's contentions are based on the premise that his version of events should be preferred to that of Mr. A, we cannot say that the hearing judge was clearly erroneous in his credibility determinations.

Unlike many cases we see involving violations of Rule 1.3, this one does not involve wholesale neglect of a client for a lengthy period of time or outright avoidance of the attorney's responsibilities to the client. But there does not appear to be any reason in the record why Mr. Singh, after being retained by Mr. A in early May 2016 to explore Mr. A's legal options, could not have completed any necessary research and provided Mr. A with those options sooner than September 14, 2016, given the impending expiration of his green card. We thus agree with the hearing judge that Mr. Singh violated Rule 1.3 during that period of 2016 and overrule his exception.

*Rule 1.4 (Communication)*

Rule 1.4 provides, in pertinent part:

(a) A lawyer shall:

\* \* \*

    (2) keep the client reasonably informed about the status of the matter;

    (3) promptly comply with reasonable requests for information;

\* \* \*

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Again, there appears to be no contention that Mr. Singh violated this rule in his initial representation of Mr. A and Mr. J during 2014 or in his efforts to pursue a solo I-751 petition after his September 2016 meeting with Mr. A. The focus of this charge is the period between May 2016, after Mr. A retained Mr. Singh to explore his options, and September 2016, when they met to discuss those options.

The hearing judge concluded that Mr. Singh violated Rule 1.4(a)(2) & (a)(3) because, during that period, Mr. Singh failed to keep Mr. A reasonably informed about the status of his efforts to explore Mr. A's legal options based on alleged abuse and failed to comply with Mr. A's reasonable requests for information.[19] The hearing judge also concluded that Mr. Singh violated Rule 1.4(b) in that he failed to explain adequately to Mr. A the limited nature of the legal work he had agreed to undertake at their May 2016 meeting – *i.e.*, exploring potential criminal charges and options for Mr. A, as opposed to representing him on a solo I-751 petition. The hearing judge faulted Mr. Singh for exacerbating Mr. A's confusion on that subject.

Mr. Singh excepts to these conclusions. He reprises all the communications that occurred between Mr. A and Mr. Singh during 2014 through early 2016, as well as those between Mr. A and Ms. Villanueva, and suggests that they undermine any conclusion that Mr. Singh failed to communicate adequately with this client. Mr. Singh asserts that he

---

[19] As noted by Bar Counsel in its exceptions, in stating this conclusion, the hearing judge's opinion cites "Rule 1.4(b) and (c)," which appears to be a typographical error, as the opinion actually paraphrases Rule 1.4(a)(2) and (a)(3) and elsewhere refers to the latter sections of the rule.

advised Mr. A by phone as to the results of his cyberstalking research and that any delay on proceeding with advice on the I-751 petition was occasioned by Mr. A's indecision about whether to reconcile with Mr. J or to pursue a solo petition. Mr. Singh characterizes the hearing judge's perspective on this attorney-client relationship as "myopic."

Much of Mr. Singh's exception to the hearing judge's conclusion is rooted in his disagreement with the hearing judge's decision to credit Mr. A's version of events during this period instead of that of Mr. Singh and his legal assistant. As is usually the case, we rely on the fact findings and credibility determinations of the hearing judge. We have no reason to regard them as clearly erroneous based on our review of the record. We also note that, in his testimony at the hearing, Mr. Singh admitted that he avoided responding to Mr. A's telephone calls and that, when Mr. A did get through on the phone, he usually ended up speaking with Ms. Villanueva.

A review of the numerous emails and texts that Mr. A provided to Mr. Singh's firm suggests that he may have been a "needy" client who was demanding attention beyond what he had agreed to pay for. On the other hand, as the hearing judge observed, while Mr. Singh "was not required to accept every call from the client at all hours of day and night," it was his duty to convey his advice "in prompt and timely fashion." Moreover, while Mr. Singh was careful to recite his position in writing when he "fired" this client in October 2016, there is scant documentation of any advice or communications by Mr. Singh to Mr. A during preceding months after he had been retained by Mr. A the second time. We overrule Mr. Singh's exception.

*Rule 8.4(d) (Conduct Prejudicial to the Administration of Justice)*

The hearing judge concluded that Mr. Singh's failure to preserve the retainer letters that he claimed Mr. A had executed was "prejudicial to the administration of justice" – a violation of Rule 8.4(d). The hearing judge particularly focused on the retainer letter allegedly executed by Mr. A in May 2016 that presumably would have clarified the scope of representation that Mr. Singh had undertaken at that time and the purpose of Mr. A's $900 payment – a matter of dispute at the hearing. The hearing judge observed that the retainer letter would have been critical evidence of some of the alleged violations, or of Mr. Singh's defenses to those allegations.

Mr. Singh excepted to the conclusion that he violated Rule 8.4(d), arguing his failure to locate the retainer letter was accidental, not intentional.

We agree that Mr. Singh should have kept his retainer agreements – for his own sake. His failure to locate them, provide them to Bar Counsel, and present them at the hearing operated to his detriment. The hearing judge expressed some skepticism as to their absence from Mr. Singh's client file, which clearly affected the hearing judge's decision to credit the testimony of Mr. A over that of Mr. Singh in certain respects. It was appropriate for the hearing judge to do so. However, we decline to convert the amorphous catchall language of Rule 8.4(d) into a retroactive document retention requirement. We sustain Mr. Singh's exception.

## B.      *Conflict of Interest Arising from Prior Representation of Mr. J*

Rule 1.7 prohibits an attorney from representing a client if the representation involves a conflict of interest. In pertinent part, Rule 1.7(a)(2) states that there is a conflict

25

of interest if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, *a former client* or a third person or by a personal interest of the lawyer." (emphasis added). In the face of such a conflict, the attorney may proceed with the representation if four specified conditions are met, including that "each affected client gives informed consent, confirmed in writing." Rule 1.7(b)(4).

Mr. Singh had represented both Mr. A and Mr. J in 2014 when he made the various filings with USCIS on their behalf to apply for permanent resident status for Mr. A and prepared both of them for their interview with that agency. The hearing judge concluded that Mr. Singh violated Rule 1.7(a)(2) in 2016 when he undertook representation of Mr. A alone, which involved documenting and seeking relief based on alleged malfeasance by Mr. J.[20] The hearing judge noted that, on Mr. A's behalf, Mr. Singh conducted research and provided advice to Mr. A about pursuing a criminal prosecution of Mr. J. The hearing judge reasoned that Mr. Singh was under a continuing obligation not to take action adverse to Mr. J, a former client.

Mr. Singh excepts to this conclusion. He asserts that nothing about his representation of Mr. J in 2014 would have limited his representation of Mr. A in 2016. He notes that Mr. J, as the sponsoring spouse in the 2014 filings, was obligated to provide

---

[20] The hearing judge also found that Mr. Singh violated Rule 1.7(a)(1), which generally provides that it is a conflict of interest if "the representation of one client will be directly adverse to another client." Mr. Singh excepted to this conclusion on its merits and Bar Counsel, in its own exceptions, disclaimed that it had charged or proved a violation of that provision. Accordingly, we will not further address Rule 1.7(a)(1).

only limited personal information to USCIS on the immigration forms and to attend an interview with Mr. A. Mr. Singh denies receiving any truly confidential information from Mr. J during the course of his representation of both spouses in 2014. He emphasizes that Mr. J was no longer his client at the time Mr. A consulted him in 2016.

Under the circumstances of this particular case – where Mr. Singh undertook to research the possibility of pursuing criminal charges against Mr. J – we agree with the hearing judge that Mr. Singh violated Rule 1.7(a)(2). Mr. Singh himself testified at the hearing that he believed that he was limited in his research into criminal charges against Mr. J in Virginia, not only because he is not a Virginia lawyer, but also by a potential conflict of interest due to his prior representation of Mr. J. Despite that belief, he did not obtain the informed consent of the two clients. We overrule Mr. Singh's exception.

However, Rule 1.7(a)(2) does not prohibit an attorney from taking any action that may be "adverse" to a former client – just from undertaking representation of a current client that will be "materially limited" by a former attorney-client relationship.[21] Thus, we decline to hold that any attorney who assists a married couple in filing the necessary forms with USCIS for the citizen spouse to sponsor the immigrant spouse as a permanent resident is necessarily foreclosed by this rule from later representing the immigrant spouse in a solo I-751 petition based on spousal abuse.

---

[21] In certain circumstances, Rule 1.9 prohibits an attorney from representing a client whose interests are "materially adverse" to those of a former client. As noted earlier, the hearing judge concluded that the evidence did not establish a violation of that rule in this case and Bar Counsel has not excepted to that conclusion.

## C.     *Violation Related to the Release*

Rule 1.8(h) provides that "a lawyer shall not: (1) make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement; or (2) settle a claim or potential claim for such liability with an unrepresented client or former client unless that person is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel in connection therewith."

As recounted above, shortly after Bar Counsel asked for a response from Mr. Singh concerning Mr. A's complaint, Mr. Singh decided to provide the refund that Mr. A had been requesting and obtained a broad release from Mr. A in connection with that refund – which he then enclosed with his timely response to Bar Counsel. That release did not comply with Rule 1.8(h), as it purported to limit Mr. Singh's liability to Mr. A in connection with the I-751 petition, even though Mr. Singh had not advised Mr. A in writing of the desirability of obtaining independent legal counsel concerning the release.

Mr. Singh initiated, or at the very least embraced, the idea of obtaining such a release as a way to defuse Bar Counsel's investigation. At some point after realizing that the release created an additional violation and exacerbated his issues with Bar Counsel, Mr. Singh apparently decided to distance himself from it. Mr. Singh excepts to the hearing judge's conclusion that he violated Rule 1.8, arguing that the hearing judge failed to account for Ms. Villanueva's testimony that she initiated the idea of obtaining a release.

The question of who first thought of obtaining a release from Mr. A is of limited relevance[22] as there is no question that Mr. Singh adopted that release and made use of it shortly after it was executed in an effort to truncate Bar Counsel's investigation of Mr. A's complaint. Moreover, there is no dispute that Mr. Singh failed to advise Mr. A, then or later, in writing or orally, that it was advisable for him to seek independent legal advice in connection with such a release of liability. As indicated earlier, to the extent that the witnesses at the hearing gave differing accounts as to how the release came to be executed, we defer to the hearing judge on which witnesses and which version to credit.

We agree with the hearing judge that Mr. Singh violated Rule 1.8(h) in connection with the release. We overrule Mr. Singh's exception to this conclusion.

### D.    *Violations Related to Required Deposits into a Trust Account*

*Rule 1.15 (Safekeeping Property) and Maryland Rule 19-404 (Trust Account)*

In relevant part, Rule 1.15(a) mandates that a lawyer "hold the property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property." Such funds are to be placed in an attorney trust account in accordance with Maryland Rule 19-404,[23] which independently requires that, except as

---

[22] Even if Ms. Villanueva had acted completely independently of Mr. Singh in obtaining the release from Mr. A, Mr. Singh ratified that conduct in his December 2016 response to Bar Counsel in which he enclosed the release and in his counsel's communication to Bar Counsel in March 2017 (also signed by Mr. Singh) in which he appropriately took responsibility for the release. *See* Rule 5.3(c)(1) (attorney responsible for conduct of non-attorney employee that attorney ratifies).

[23] As noted earlier, at the time of most of the transactions at issue, Maryland Rule 19-404 was codified as Maryland Rule 16-604.

may be otherwise permitted by law, all funds received from a client or on behalf of a client are to be deposited in an attorney trust account. Rule 1.15(c) further provides that "a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred." An attorney may adopt a different practice with respect to prepaid legal fees only if a client provides informed consent to that arrangement in writing.

Mr. Singh concedes that he failed to comply with these rules not only with respect to funds received from Mr. A for filing fees, but also with respect to funds received from a number of other clients for filing fees over a three-year period. In those instances, he deposited those funds in his operating account, thus failing to keep those client funds in his attorney trust account until the filing fees were due. Although there is no allegation that these funds were not used for their intended purpose or that any of his clients suffered a loss, the premature deposit of client funds in an operating account can be a first step to defalcation and more serious misconduct. *See Attorney Grievance Comm'n v. Blatt*, ___ Md. ___, ___ (2019).

We agree with the hearing judge that Mr. Singh violated Rule 1.15(a) & (c), as well as Maryland Rule 19-404.[24]

---

[24] Bar Counsel excepts to the hearing judge's failure to find a violation of Rule 8.4(d), which provides that it is misconduct for an attorney to engage in conduct "prejudicial to the administration of justice." Bar Counsel argues that Mr. Singh violated that rule when he failed to comply with the rules concerning required deposits in trust accounts and cites *Attorney Grievance Comm'n v. Mungin*, 439 Md. 290 (2014). Although a failure to safeguard client funds may violate Rule 8.4(d), in our view it is not the case that every violation of the trust account rules automatically generates a violation of Rule 8.4(d). In *Mungin*, there were unexplained cash withdrawals from the trust account and

*Rule 8.1(a) (False Statements in a Disciplinary Matter)*

While Mr. Singh now concedes that he failed to comply with these trust account rules, that was not necessarily the case during Bar Counsel's investigation of Mr. A's complaint. In an investigative deposition taken by Bar Counsel, Mr. Singh admitted that he had written checks for filing fees for the 2014 filings with USCIS on behalf of Mr. A and Mr. J from his operating account. He explained that he "usually" maintained client funds in his trust account and transferred money for filing fees to the operating account shortly before payment was to be made. The relevant testimony at the deposition was as follows:

> Bar Counsel: And these are the filing fees that went out with the I-130 back in 2014 [and] the filing fee for the I-485…. And both of these checks were written from your operating account?
>
> Mr. Singh: That's right.
>
> Bar Counsel: Can you explain why?
>
> Mr. Singh: We do not usually write checks from the [trust] account. We transfer from the [trust] account into the operating account before we write checks usually.
>
> . . .
>
> Bar Counsel: Okay. So, when Mr. A and/or his spouse, Mr. J, gave you the money for the filing fees, were those placed in the operating account?

the trust account violations also involved the failure to properly account for, and properly disburse, funds to medical providers on behalf of multiple clients. In Mr. Singh's case, the trust account issues did not involve client harm and were largely independent of the primary violations arising out of his representation of one client, Mr. A. We overrule this exception.

Mr. Singh:      I would think that filing fees would go into the [trust] account and then transfer into the operating account to make the payments.

Bar Counsel:    … And is that typically how you do it?

Mr. Singh:      Usually, yes.

Bar Counsel:    Okay. And how much — like, when would that transfer have occurred from your trust account to your operating account for the filing fees?

Mr. Singh:      Probably — I don't know.  Usually it's a couple days before we write the check, just to make sure that we have the funds.

As indicated earlier, a subsequent analysis of Mr. Singh's bank records by Bar Counsel's investigator revealed that what Mr. Singh described as his usual practice was more the exception than the rule.

Rule 8.1(a) states that "in connection with a disciplinary matter," a lawyer may not "knowingly make a false statement of material fact."  The hearing judge concluded that Mr. Singh violated this provision when he stated during the investigative deposition that he "usually" would deposit client funds intended for filing fees into a trust account and then transfer the funds to his operating account when later writing a check for the filing fees.

Mr. Singh excepts to this conclusion, arguing that while his testimony was inaccurate, it was not intentionally so.  He points out that not every inaccurate statement made to Bar Counsel violates the rule – only *knowingly* false statements – and that he admitted at the hearing of this matter that his deposition testimony was inaccurate.

It is true that Mr. Singh did not have the firm's bank records in front of him at the time of his deposition, and that his answers were hedged – *i.e.,* "usually," "Probably – I don't know," "I would think." While these answers are guarded and qualified, they are also clearly an effort to get the questioner to draw the conclusion that funds "usually" first went into the trust account – a conclusion that Mr. Singh, as a solo practitioner who controlled the firm's accounts must have known, and now concedes, was inaccurate. This was not a misestimate; it was misleading.

Mr. Singh's later admission as to problems with his trust account practices came after Bar Counsel had obtained his bank records and conclusively documented that his deposition statement was incorrect. While we appreciate his admission at the hearing of his non-compliance and of the inaccuracy of his May 2017 statement, we cannot accord that admission the weight that Mr. Singh seeks. It is not as though he corrected the misstatement in his deposition testimony before it was disproven.[25]

We agree with the hearing judge that the deposition testimony violated Rule 8.1(a) in this respect and overrule Mr. Singh's exception.

*Rule 8.4(c) (Misrepresentation)*

In pertinent part, Rule 8.4 provides that, "[i]t is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or] (d) engage in conduct that is prejudicial to the administration of justice[.]"

---

[25] *Cf.* Rule 8.1(b) (attorney "shall not . . . fail . . . to correct a misapprehension" that the attorney knows to have arisen in a disciplinary matter).

The hearing judge concluded that Mr. Singh had violated both of these subsections of Rule 8.4 apparently on the ground that any violation of Rule 8.1(a) (false statement to Bar Counsel) also violates those provisions, without further elaboration. We agree with the general proposition that a violation of Rule 8.1(a) also violates Rule 8.4(c) as a knowingly false statement to Bar Counsel qualifies as at least conduct involving misrepresentation. We decline to make the same equation with Rule 8.4(d) in all cases.

## III

## Sanction

The purpose of a sanction in an attorney discipline case is not so much to punish the attorney as "to protect the public and the public's confidence in the legal profession." *Attorney Grievance Comm'n v. Greenleaf*, 438 Md. 151, 163 (2014). Our rules do not prescribe specific sanctions for specific transgressions, unlike the rules of football – *i.e.*, five yards for offsides, 15 yards for a personal foul, and so on. Judgment must be exercised. The sanction should be "commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Grievance Comm'n v. Stein*, 373 Md. 531, 537 (2003). Any mitigating or aggravating factors peculiar to the respondent or the particular case should also be considered. *Attorney Grievance Comm'n v. Blatt*, ___ Md. ___, ___ n.19 (2019) (listing aggravating and mitigating factors). In the end, there is no rote formula. To paraphrase an oft-quoted insight, each unhappy instance of attorney

34

misconduct is unhappy in its own way.[26]  Therefore, we must tailor the sanction to the particular facts and circumstances of each case.

Bar Counsel has recommended that we indefinitely suspend Mr. Singh from the practice of law.  In support of that recommendation, Bar Counsel relies primarily on the violations related to the required deposit of client funds in trust accounts, and Mr. Singh's deposition testimony on that subject.  Bar Counsel notes that this Court has stated that misappropriation of client funds usually results in disbarment of an attorney, but "[w]here there is no finding of intentional misappropriation . . . and where the misconduct did not result in financial loss to any of the respondent's clients, an indefinite suspension ordinarily is the appropriate sanction." *Attorney Grievance Comm'n v. DiCicco*, 369 Md. 662, 687 (2002); *see also Attorney Grievance Comm'n v. Mungin*, 439 Md. 290, 320-22 (2014).

Mr. Singh takes the position that his misconduct was less serious than in certain other cases involving attorneys who, like Mr. Singh, had no prior disciplinary record and received sanctions less than an indefinite suspension.  *See, e.g.*, *Attorney Grievance Comm'n v. Adams*, 349 Md. 86 (1998) (imposing 30-day suspension where an attorney, who had no prior disciplinary record, unintentionally mishandled client funds and no harm to clients resulted).  In his view, the sanction here should be a reprimand.

With respect to aggravating factors, the hearing judge found clear and convincing evidence of several.  Chief among them were: *a dishonest or selfish motive* as illustrated

---

[26] Leo Tolstoy, *Anna Karenina* ("All happy families are alike; each unhappy family is unhappy in its own way.").

35

by the ill-fated release; *obstruction of the disciplinary process* in Mr. Singh's deposition testimony concerning his trust account practices; and a *failure to acknowledge wrongful conduct* in attributing some of the violations to the conduct of Mr. A or Ms. Villanueva.[27] The hearing judge also found that Mr. A, as an immigrant, was a *vulnerable victim* of some of these violations[28] and that Mr. Singh had *substantial experience* in the practice of law, both of which are aggravating factors.

---

[27] The hearing judge found *multiple violations* and a *pattern of misconduct* as additional aggravating factors. We give less weight to those two factors in these particular circumstances.

It is true, in a literal sense, that Mr. Singh has been found to have committed more than one violation of the ethical rules, although that is also true in virtually every case in which professional misconduct is found. However, in this case, unlike many other cases, most of the violations arise from one matter for one client.

It is also true that Mr. Singh's failure to deposit client funds for filing fees into his trust account could be considered a "pattern" of sorts. However, had there been only one or two such incidents, it is highly unlikely that it would be treated as a matter for professional discipline.

We accord greater weight to these two aggravating factors when the record reflects multiple incidents of misconduct resulting in harm to multiple clients, which unfortunately is sometimes the case.

[28] Mr. Singh has objected to the notion that Mr. A is a vulnerable victim simply because he is an immigrant, noting that Mr. A is a mature adult with lawful immigration status and an ability to communicate in English. However, while Mr. A's circumstances may be superior to those of many other immigrants, even in his case the ability to work, travel, and remain in this country depended on sound advice and conscientious efforts by an attorney. *See Attorney Grievance Comm'n v. Landeo*, 446 Md. 294, 352-53 (2016) (stressing the importance of diligent representation and adequate communication in immigration cases).

There are at least two mitigating factors in Mr. Singh's favor. In addition to the *absence of any prior discipline* involving Mr. Singh, the hearing judge recognized that Mr. Singh had undertaken remedial efforts *to rectify the consequences of his misconduct* in hiring a forensic accountant to ensure that he was currently handling client funds appropriately and revising his office procedures to make sure he is in compliance with those rules. The hearing judge also noted that there was no evidence that Mr. Singh misappropriated any client funds or failed to devote client funds to their intended purpose.[29]

Bar Counsel's recommendation of an indefinite suspension is not without justification. We have imposed that sanction in other cases involving violations of Rule 8.1(a), as noted by Bar Counsel. However, the two cases primarily relied upon by Bar Counsel both involved significant harm to clients and false statements to Bar Counsel to conceal that harm. *Attorney Grievance Comm'n v. Lee*, 393 Md. 385 (2006); *Attorney Grievance Comm'n v. Brigerman*, 441 Md. 23 (2014).

In *Lee*, the respondent attorney failed to do any work on his client's postconviction petition over a two-year period despite retaining the $3,500 he had been paid for that purpose and being contacted hundreds of times by the client. The false statement

---

[29] A *timely good faith effort to make restitution* can also be a mitigating factor. Here, Mr. Singh refunded to Mr. A the $900 that was the subject of their fee dispute. Mr. Singh held to the not unreasonable view that he had earned at least that amount in his efforts to respond to Mr. A's requests concerning his cyberstalking allegations and the preliminary work on the solo I-751 petition. However, as the hearing judge noted, this refund was made only after Mr. Singh had received an inquiry from Bar Counsel about Mr. A's complaint. Moreover, the refund was made in return for a release that itself violated an ethical rule. As the hearing judge suggested, any mitigating weight attributed to it must be discounted.

underlying the 8.1(a) violation was the excuse that the attorney gave to Bar Counsel for his inaction – that he had not received the transcripts of the original criminal proceeding. In fact, the client's wife had delivered the transcripts to him. It is also notable that the respondent attorney in *Lee* had a prior disciplinary record.

*Brigerman* involved multiple client complaints against the respondent attorney for ignoring requests from a client for his file, failing to turn over settlement proceeds to another client, charging a third client a flat fee of $2,500 and retaining that sum without performing any significant work. In each instance, the respondent attorney ignored numerous client inquiries concerning his inaction. He also falsely represented to Bar Counsel that he would turn over one client's file to the client upon request.

There is no question that any attempt to mislead Bar Counsel is a serious matter that warrants a sanction beyond a reprimand, regardless of whether the underlying violations caused any harm to clients. Mr. Singh's testimony in the investigative deposition – and other attempts to distance himself from violations of the ethical rules – magnified the seriousness of this case. Nonetheless, the absence of client harm and certain other considerations lead us to locate this case at a different place than *Lee* and *Brigerman* on the continuum of sanctions for misconduct.

Despite the violations enumerated above, Mr. A benefitted from his attorney-client relationship with Mr. Singh in 2016. Mr. A not only had the results of Mr. Singh's research concerning cyberstalking, but also apparently followed the course outlined by Mr. Singh to remove the conditions on his green card. He had the benefit of Mr. Singh's review and edit of his statement concerning the abuse and Mr. Singh's referral to the psychologist for

38

an expedited report on the effects of that abuse.  In the end, he paid Mr. Singh only a $150 consultation fee.

We also note the important nature of Mr. Singh's practice.  He serves clients of moderate means, like Mr. A, in Montgomery County in a practice largely devoted to immigration law.  No Maryland county has more immigrants or a higher percentage of foreign born residents; nearly one-third of Montgomery County's residents were born abroad.  As noted earlier, immigrants, who may find themselves without counsel even when the stakes are highest, are a vulnerable class of client often at the margins of society.

In an attorney discipline case, as we are fond of repeating, our primary goal is to protect the public and deter future misconduct.  *Attorney Grievance Comm'n v. Woolery*, 456 Md. 483, 497-98 (2017).  In this case, a suspension is called for to deter Mr. Singh and others from misleading Bar Counsel or from adopting sloppy practices with client funds that, even if innocuous in the particular case, could lead to defalcation and serious harm to clients.  It is also critical that attorneys thoroughly and carefully communicate with clients from different cultural and linguistic backgrounds, and do their best to ensure that such clients completely understand their legal options.  That message can be sent without sidelining for an indefinite period an attorney who has no other record of discipline and who serves a vulnerable class of clients of moderate means.  A 60-day suspension achieves that balance.  The suspension shall begin 30 days after the date on which this opinion is filed.

**IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THE COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(D), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST RAJ SANJEET SINGH.**

Circuit Court for Montgomery County
Case No. 448654-V
Argued: February 28, 2019

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 6

September Term, 2018

—————————————————————

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

RAJ SANJEET SINGH

—————————————————————

Barbera, C.J.
*Greene
McDonald
Watts
Hotten
Getty
Adkins, Sally D. (Senior Judge,
Specially Assigned),

JJ.

—————————————————————

Dissenting Opinion by Watts, J., which Greene
and Hotten, JJ., join.

—————————————————————

Filed: July 17, 2019

*Greene, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to the Md. Constitution, Article IV,
Section 3A, he also participated in the decision
and adoption of this opinion.

Respectfully, I dissent.   I would adopt Bar Counsel's recommendation and indefinitely suspend Raj Sanjeet Singh, Respondent, from the practice of law in Maryland, or, in the alternative, indefinitely suspend Singh from the practice of law in Maryland with the right to apply for reinstatement after sixty days.

As the Majority concludes, Singh violated numerous Maryland Attorneys' Rules of Professional Conduct ("MARPC").  See Maj. Slip Op. at 20-34.  Chief among other misconduct, Singh violated MARPC 8.1(a) (Disciplinary Matters--False Statement of Material Fact) and 8.4(c) (Dishonesty, Fraud, Deceit or Misrepresentation) by falsely testifying at a deposition in this attorney discipline proceeding that his practice was to deposit a client's filing fees into his attorney trust account, transfer them to his operating account, and then, a couple days later, write a check to U.S. Citizenship and Immigration Services.  See id. at 31-34.  Bank records revealed that, in actuality, Singh's practice was to deposit a client's filing fees into his operating account, where they remained for weeks, months, or even years before he finally wrote a check to U.S. Citizenship and Immigration Services.[1]

---

[1]The Majority sustains Singh's exception to the hearing judge's conclusion that he violated MARPC 8.4(d) (Conduct That Is Prejudicial to the Administration of Justice) by failing to preserve retainer letters that he alleged Mr. A had signed.  See Maj. Slip Op. at 25.  The Majority does not uphold the hearing judge's conclusion that Singh committed a separate violation of MARPC 8.4(d) through his false statements to Bar Counsel, which also constituted a violation of MARPC 8.1(a).  See id. at 34.  I agree with the hearing judge's conclusion that Singh engaged in conduct that was prejudicial to the administration of justice by lying under oath to Bar Counsel.  Independent of the hearing judge's conclusion, I would determine that Singh also violated MARPC 8.4(d) by testifying falsely at the deposition.  In any event, the existence of a violation of MARPC 8.4(d), or a lack

Additionally, as the Majority notes, the hearing judge found several aggravating factors, see Maj. Slip Op. at 35-36, including submission of false statements during this attorney discipline proceeding and bad faith obstruction of this attorney discipline proceeding. The hearing judge found that Singh gave false testimony at the hearing in this attorney discipline proceeding.[2] Specifically, Singh variously testified that: (1) he did not have his bank records when he testified at his deposition; (2) he had his bank records when he testified at his deposition, but he had not gone through them; and (3) he had either not ordered his bank records, or not gone through them.

"[A]bsent compelling extenuating circumstances[,] disbarment ordinarily should be the sanction for intentional dishonest conduct." Attorney Grievance Comm'n v. Lefkowitz, 463 Md. 165, 175, 205 A.3d 17, 23 (2019) (cleaned up). That said, this Court has imposed lesser sanctions on certain lawyers who lied only to Bar Counsel—as opposed to lying to a client, opposing counsel, and/or a court. See, e.g., Attorney Grievance Comm'n v. Lee, 393 Md. 385, 415, 903 A.2d 360, 378 (2006). Relying on Lee, Bar Counsel recommends an indefinite suspension. Bar Counsel's recommendation is one of the factors that this Court considers when determining the appropriate sanction for a lawyer's misconduct. See Attorney Grievance Comm'n v. Greenleaf, 438 Md. 151, 169, 91 A.3d 1066, 1076 (2014).

---

thereof, does not affect my view as to the appropriate sanction based on his violations of multiple MARPC.

[2]The hearing judge found that, while testifying at the hearing in this attorney discipline proceeding, Singh provided a false explanation for his false deposition testimony.

I would either adopt Bar Counsel's recommendation of an indefinite suspension or impose an indefinite suspension with the right to apply for reinstatement after sixty days. In sharp contrast to Bar Counsel's recommendation, the Majority merely suspends Singh for sixty days. See Maj. Slip Op. at 39. I fear that a two-month suspension will not impress upon Singh and other lawyers the importance of not making false statements to Bar Counsel. Indeed, Singh's misconduct is even more egregious than that of lawyers who lie to Bar Counsel in correspondence, such as letters or e-mails. Singh gave false testimony at a deposition, then gave false testimony at the hearing in this attorney discipline proceeding. A sixty-day suspension is not sufficient to protect the public and send the message that repeatedly lying under oath is not acceptable behavior for a member of the Bar of Maryland.

In its discussion of the appropriate sanction, the Majority distinguishes the cases on which Bar Counsel relies—*i.e.*, Lee and Attorney Grievance Comm'n v. Brigerman, 441 Md. 23, 105 A.3d 467 (2014)—on the ground that those cases "involved significant harm to clients and false statements to Bar Counsel to conceal that harm." Maj. Slip Op. at 37 (citations omitted). To be sure, there are factual distinctions to be drawn between Lee and Brigerman and this case, as the Majority does. But, Lee and Brigerman, unlike Singh, made false statements to Bar Counsel only, and did not give false testimony under oath. Although Singh's misconduct did not directly harm anyone—and, by extension, there was no harm for him to conceal from Bar Counsel—Singh nonetheless lied to Bar Counsel while testifying falsely under oath at a deposition in an attempt to conceal his misconduct. Indeed, the Majority acknowledges that Singh's deposition testimony was an "attempt[] to

distance himself from violations of the ethical rules" that "magnified the seriousness of this case." Maj. Slip Op. at 38. In my view, Singh's lies under oath are the most serious of his many instances of misconduct, and warrant adopting Bar Counsel's recommendation of an indefinite suspension or an indefinite suspension with the right to apply for reinstatement after sixty days.

The Majority downplays the significance of Singh having made false statements under oath and repeatedly refers to the circumstance that Singh's misconduct did not directly harm anyone. See id. at 1, 2, 18, 31 n.24, 37, 38. As grounds for the sanction imposed, the Majority indicates that we must "deter [] Singh and others from misleading Bar Counsel or from adopting sloppy practices with client funds that, even if innocuous in the particular case, could lead to defalcation and serious harm to clients." Id. at 39. The Majority essentially requires that dishonesty in the form of false testimony result in harm to a client before an indefinite suspension may be imposed. This is not consistent with our case law. My concern is that the sixty-day suspension that the Majority levies will fail to deter an egregious form of misconduct—namely, lying repeatedly under oath.

For the above reasons, respectfully, I dissent.

Judges Greene and Hotten have authorized me to state that they join in this opinion.